**SQUARE D COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18700.**

United States Court of Appeals
Ninth Circuit.

May 4, 1964.

---

and order are reported at 142 NLRB No. 43.

The Board found that the Company has refused to bargain collectively with the Union,[1] in violation of § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1),[2] by refusing to furnish the Union with relevant data with respect to the operation of its group incentive plan and by refusing to discuss and negotiate with the Union concerning grievances arising out of the operation of said plan.

The Company's position is that the Union, by collective bargaining contract, had waived any right to bargain concerning the group incentive plan, to secure data concerning the plan or to process grievances respecting its operation. The Company here contends that since construction of the collective bargaining contract is involved and since the contract provides for arbitration of disputes respecting its construction, the meaning of the contract in regard to the waiver for which the Company contends should have been submitted to arbitration.

In May, 1954, the Union was certified by the Board as the representative of the Company's nonsupervisory production and maintenance employees at the Company's Los Angeles plants. The Company and the Union have regularly negotiated collective bargaining contracts since that time.

The Company has operated for many years under a unilaterally established and unilaterally administered group incentive plan whereby plant employees are divided into two groups or departments. Each group or department is rewarded by extra pay, calculated upon a scale devised and maintained solely by the Company, and predicated upon group or department output which is over and above the amount specified by the Company as a

Foley, Sammond & Lardner, James I. Poole, Milwaukee, Wis., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison and Margaret M. Farmer, Attys., N. L. R. B., Washington, D. C., for respondent.

Before POPE, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge.

This case is before the court on petition of Square D Company (herein called the Company) to review and set aside an order of the National Labor Relations Board, issued on May 1, 1963. In its answer the Board has requested enforcement of its order. The Board's decision

1. International Union of Electrical, Radio & Machine Workers, AFL-CIO, Local 1503, IUE, AFL-CIO.

2. "(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 157 of this title;
* * * * *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

normal, fair day's work. The Union has repeatedly urged, during contract negotiations, that the existing incentive plan be incorporated into the agreement. The Company has consistently refused.

The contract in force at the time of the events of this case was signed on October 17, 1960 for a 1-year term. During the course of the negotiations preceding the execution of that contract, the Union again urged, as it had urged in the past, that the group incentive plan be incorporated into the contract. The Company had refused this request and the contract signed by the parties had made no reference to the incentive plan. It did, however, contain provisions, repeated from previous contracts,[3] which the Company contends supports its refusal either to discuss or negotiate grievances arising out of its operation of the plan or to furnish the Union with requested data on the plan necessary for the processing of grievances thereon.

The contract provides a three-step grievance procedure. Step 1 consists of the grievance being taken up by the employee or his area steward with the foreman or supervisor. By step 2 it is taken up by the employee, area steward, chief steward or Union president with three representatives of the Company. By step 3 discussions take place between the Union grievance committee and representatives of the Company. The contract also provides for arbitration after these three steps, with each side appointing a member of the board of arbitration and the two members thus appointed selecting a third. The contract also provides, "All disputes which arise as to the meaning, application or interpretation of this agreement shall be adjusted * * * through the grievance procedure, culminating in arbitration."

On March 7 and 8, 1961, the Company handed warning notices to employees Charles Waldron and Robert Utter, informing each that his efficiency and production record was below average and stating, "Due to your efficiency and your production record, your cooperation is below average. Your poor effort is not helping your fellow employees make bonus."

On March 9, the Union steward, accompanied by Waldron and Utter, filed grievances with the foreman in accordance with step 1 of the grievance procedure of the contract. The foreman ruled the warning notices to have been justified. On March 13 the chief steward of the Union filed a step 2 grievance form for each of these grievances, stating that the Union felt the warning to be unfair and requesting that the Company remove it from each employee's record. On March 16, the Company's production superintendent rejected each grievance, stating, "The Company's position is that this matter is not covered by the collective bargaining agreement and therefore is not subject to the grievance procedure."

3. Article XVII, § 3, provides:

"The parties hereto acknowledge that during the negotiations which resulted in this agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement.

"Therefore, the Company and the Union for the life of this agreement each voluntarily and unqualifyingly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this agreement, or with respect to any subject or matter not specifically referred to or covered in this agreement even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this agreement."

Article XVIII provides as follows:

"The right of management in the operation of its business is unlimited except as it may be expressly and specifically restricted by the provisions of this agreement, and this agreement is the sole agreement between the parties."

The operation of the group incentive plan had been an intermittent source of dissatisfaction to the Union over a substantial period of time. On March 7, the Union requested the Company to supply it with "a copy of the weekly changes that have occurred for all Incentive groups," together with changes, if any, in the methods or the formula used in computing the actual incentive figures arrived at during the period from March 1, 1960, through March 1, 1961, "for the purpose of verifying our Incentive System record with that of the company's and to enable us to properly and intelligently negotiate the Group Incentive grievances."

On March 13, the Company denied the request, stating, in part, "The group incentive was the subject of collective bargaining. It was agreed during negotiations that the group incentive would not be made a part of the contract and subject to grievance procedure. Therefore, this is not a matter which falls within the scope of the collective bargaining agreement."

On March 10, before the above answer was received by the Union, the Union wrote the Company requesting "in connection with the processing of certain grievances and in order to obtain data for future wage negotiations" that the Company supply it with certain information as it applied to incentive groups 21 and 23, including time studies or work standards, weekly production records and changes in the bonus percentages for these groups, together with "specific information regarding the efficiency and production relating to the two men who were given warning notices during the past ten days as having affected their groups' incentive earnings."

The Company replied to this request on March 16, stating: "Our March 13 reply to your March 7 letter indicated the company was not obligated to furnish information on the Group Incentive for processing grievances. For the purpose of future contract negotiations, the company is gathering certain information

which it will furnish the union as it becomes available."

On April 13, the Union filed a charge with the Board alleging a refusal by the Company to bargain by its refusal to accept and process certain grievances, by unilaterally decreasing the incentive wages paid, and by refusing to furnish information with respect to the incentive system so that certain grievances pertaining thereto could be intelligently processed. A copy of the charge was served on the Company by mail on April 13. On April 14, the Company wrote to the Union, referred to its promise of March 16 to supply information as it became available for future contract negotiations, and sent the pay index tabulated on a quarterly basis for the fourth quarter of 1960 and the first quarter of 1961 for the various incentive groups.

Upon the foregoing facts, the Board, in agreement with the Trial Examiner, found that the operation of the Company's incentive plan was a matter concerning which grievances could properly be filed; and that the Company's refusal to discuss and negotiate concerning the grievances herein involved and to supply the Union with relevant information with respect to them upon request, constituted violations of § 8(a) (5) and (1) of the Act.

The Board's order requires the Company to cease and desist from refusing to bargain with the Union concerning grievances arising out of the operation of the group incentive plan, from refusing to furnish the Union with relevant data concerning computation or operations under the plan, or from in any like or related manner refusing to bargain with the Union or from interfering with, coercing, or restraining the employees in the exercise of rights guaranteed by § 7 of the Act.

Affirmatively, the order requires the Company to furnish the Union with relevant data concerning computations or operations under its group incentive plan, to discuss and negotiate with the Union concerning grievances arising out of the

operation of said plan, and to post appropriate notices.

The question with which we are concerned is whether the Board, by finding unfair labor practices in the Company's failure to process certain grievances and furnish information relevant thereto, improperly exercised jurisdiction with respect to disputes between the Company and the Union which should first have been submitted to the arbitration provided for in the contract.

The Board concedes that were this an action for breach of contract brought under § 301, the only action which a court initially could take would be to order the dispute submitted to arbitration, and the arbitrator would have exclusive jurisdiction to construe the contract. United Steelworkers of America v. American Mfg. Co. (1960) 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America A. F. L.-C. I. O. v. Warrior & Gulf Navigation Co. (1960) 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp. (1960) 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. The Board insists, however, that these authorities do not apply to the Board. It points out that the basic question in those Supreme Court cases was whether a federal court should interpret contract provisions to determine controversies between companies and unions, when the parties themselves had agreed to arbitrate such controversies. It points to the National Labor Relations Act which, unlike § 301, vests the Board with exclusive jurisdiction over unfair labor practices, and specifically provides in § 10(a), 29 U.S.C. § 160(a), that the Board's power to "prevent any person from engaging in any unfair labor practice * * * shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *."

Thus, with respect to unfair labor practices, the Board contends it is plain on the face of the statute that it is the Board that has primary jurisdiction and is supreme in the field, subject to the reviewing authority of the courts of appeal, and that this jurisdiction is not impaired by the fact that alternative means of resolving the controversy may exist by way of arbitration.

We may concede the Board's position if the dispute in question—the one which the Company contends should have been arbitrated—was a controversy over the applicability or violation of a duty not only prescribed by the contract but also imposed directly by the Act, disregard of which would constitute an unfair labor practice.

For example, a provision in a labor contract prohibiting the employer from discriminating against an employee because of his union membership would not compel the Board to defer to an arbitrator's determination whether this duty had been breached. Since § 8(a) of the Act carries a similar proscription the Board itself would have full power to determine the existence of, and to prevent, such discriminatory action.

The Board insists that the same situation exists here; that the duty in question—to provide relevant data—exists under the Act without regard to the merits of the grievance in connection with which it is provided. It is settled law, the Board asserts, that an employer violates § 8(a) (5) and (1) of the Act by refusing, during the terms of a contract, to furnish information to the union upon request where such information is relevant to the union's exercise of its statutory function of policing the contract or of filing grievances on behalf of the employees in the bargaining unit.[4]

4. See N.L.R.B. v. F. W. Woolworth Co. (1956) 352 U.S. 938, 77 S.Ct. 261, 1 L. Ed.2d 235 (per curiam), reversing 235 F. 2d 319 (9 Cir. 1956); J. I. Case Co. v. N.L.R.B. (7 Cir. 1959) 254 F.2d 149; N.L.R.B. v. Item Co. (5 Cir. 1955) 220 F.2d 956, cert. denied (1955) 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746.

Further, the Board asserts that the existence of a grievance procedure culminating in arbitration does not constitute a waiver by the union of its statutory right to seek redress by resort to the unfair labor practice procedures of the Act.

In support of its position the Board refers us to Timken Roller Bearing Company v. N. L. R. B. (6 Cir. 1963) 325 F.2d 746, cert. denied (1964), 84 S.Ct. 1135. In that case the Union sought wage data relevant to certain pending grievances. The Company rejected the request upon the ground that the Union had waived any right to demand such data by failing in its attempts to secure a contract provision for the production of such data. The Company contended that the question of waiver should be submitted to arbitration pursuant to contract provisions. The court held that the right to data relevant to a union's processing of grievances is conferred by the Act, and was not a right acquired through the bargaining agreement. It stated:

"Whether the demand of the Union should be honored, accordingly, does not involve the interpretation or application of the agreement, which is necessary in order to be eligible for arbitration, but, on the contrary, involves the interpretation and application of the National Labor Relations Act." 325 F.2d at 752.

It concluded that the dispute over the existence and extent of the duty to provide the information in question was not an arbitrable one under the terms of the agreement. In response to the contention that the question whether this right had been waived did involve an interpretation of the contract, the court ruled as matter of law that a waiver of the right to relevant data, being one bestowed by law, must be clear and explicit, and could not be found in the fact that such right to data had not also been made the subject of contract.

We find Timken to be distinguishable from the case before us. In Timken there was no question but that the underlying disputes, to which the Board found the wage data relevant, were, under the contract, proper subjects of grievance. There was no question, then, but that the data demanded was relevant to a valid exercise of the Union's function of processing grievances.

Here the Company does not dispute the proposition of law that the Union is entitled to data relevant to a grievance, irrespective of the merits of that grievance. This is not the dispute upon which the Company demands arbitration. That dispute is whether the Union, by contract, has waived its right to grieve respecting the group incentive plan.

The Company has taken the flat position that when an employee's complaint pertains to some action of the Company in respect to its administration or operation of the plan, then, under the collective bargaining agreement, "the matter * * * is not subject to the grievance procedure." Whether such action is a proper or justifiable application of the incentive plan, it asserts, is a matter committed solely to management decision. If the Company is right in this contention then the data in question cannot be relevant to the Union's present or potential policing of the contract through the processing of grievances, and failure to produce it does not constitute a violation of this aspect of the statutory duty to furnish information.

The answer to the dispute lies not in the provisions of the Act, for the Act does not purport to control the issue of what matters shall be subject to a contract grievance procedure. The answer lies solely in a construction of the contract—an area in which the parties themselves have agreed that the dispute shall be arbitrated.

Thus we are not faced with a situation in which the issue of a violation of the Act is related to the collective bargaining agreement only in that there may be a similar violation of the latter. Rather, the existence of an unfair labor practice here is *dependent* upon the resolution of

a preliminary dispute involving *only* the interpretation of the contract.

The Board itself has spoken most persuasively upon this precise point. In Sinclair Refining Company v. N. L. R. B. (5 Cir. 1962) 306 F.2d 569, 577 enforcement of a similar Board order, directing production of data relevant to certain grievances, was refused on the ground that there must first be arbitration to pass on the employer's contention that the contract barred the filing of grievances of the nature in question. The court referred to a previous opinion of the Board in the following language:

"In Hercules Motor Corp., 136 NLRB [No. 145]—, the Board reversed the Trial Examiner's finding that an employer was guilty of a § 8 (a)(5) refusal to bargain for failure to supply certain time study data in connection with a pending grievance. The Board described the case in this way. 'The Union's grievance involved a dispute concerning interpretation of the contract provisions * * *, the Union interpreting the contract as giving it the right to grieve over the equity of [the Employer's] rates, and the [Employer] insisting that the Union was incorrectly interpreting the contract. On its face, the contract provides machinery devised by the parties themselves for settling such disputes. Yet, instead of exhausting this procedure and proceeding within the framework of its contract, the Union elected to file charges asking the Board to intervene and resolve the dispute.' The Board, after referring to § 201(a), 29 U.S.C.A. § 171(a), and § 203(d), footnote 12, supra, the trilogy opinions of the Supreme Court requiring that grievance machinery be given full play, reached this conclusion. 'If, instead of requiring the Union in this case to give "full play" to the grievance procedure, we were to permit the facilities provided by the Act to be used in avoidance of the bargaining agreement, we would be frustrating the Act's policy of promoting industrial stabilization through collective bargaining agreements.' The Board went on, 'In this case * * * the Union sought information to support a grievance over a matter which the [Employer] maintained could not be the subject of a grievance under the contract * * *. There thus arose a dispute between the parties as to the interpretation of their contract * * *. This was a dispute for whose resolution the contract specifically provided machinery and the [Employer] properly insisted that it be settled within the agreed-upon grievance procedure.'"

For the reasons set forth by the Board in Hercules we conclude that the question whether the Union by contract had waived its right to grieve respecting the group incentive plan should have been submitted to arbitration.

In the absence of an arbitrator's decision on this issue the Board had no power to determine that the Company committed unfair labor practices by failing to negotiate grievances arising out of the operation of the incentive plan and by failing to furnish information relevant to the processing of such grievances.

The Board contends that irrespective of the question whether the data was relevant to a grievance, § 8(a)(5) and (1) was violated by the Company's refusal to furnish the data in question since the Union had requested it for use in future wage negotiations.

However, the Union did not charge the Company with a failure to furnish data for this purpose. The charge was that the Company had refused to bargain collectively "by refusing to furnish information relative to the incentive bonus plan so that the undersigned Union could intelligently process certain grievances pertaining thereto."

If the Board's complaint was intended to enlarge the scope of inquiry, it did not do so with any measure of clarity. It

referred to the Company's refusal "to furnish to the Union the data requested by it."

The Company did furnish some data pursuant to the Union's request respecting future wage negotiations. If such furnishing of data was felt to fall short of the Company's obligations, the findings of the hearing examiner are far from clear. Nor do the conclusions and order serve to clarify the matter.

The hearing examiner's conclusion of law was that the Company had violated the Act "by refusing to discuss and negotiate concerning grievances about the operation of the group incentive plan, and by refusing to furnish the Union relevant data relating to computations and operations under said plan * * *." The Board's order (as recommended by the hearing examiner and adopted by the Board) was that the Company cease and desist from "refusing to discuss and negotiate with [the Union] concerning grievances arising out of the operation of the group incentive plan or refusing to furnish said Union with relevant data concerning computations or operations under said plan."

■ The Supreme Court has cautioned that the question whether requested information is sufficiently pertinent and necessary to the Union's negotiations that the refusal to furnish it constitutes refusal to bargain in good faith, is dependent upon close scrutiny of the factual circumstances of each case. N. L. R. B. v. Truitt Mfg. Co. (1956) 351 U.S. 149, 153–154, 76 S.Ct. 753, 100 L.Ed. 1027.

Here we have no clear indication that this issue was even tried. We have no specific findings by the Board to the effect that the Company did commit such a violation of the Act, explaining the basis for such a conclusion. We conclude that the record does not support the Board's contentions in this respect.

The Board's petition for enforcement of its order is denied. It is ordered, upon the petition of the Company, that the Board's order be set aside.