NATIONAL LABOR RELATIONS BOARD *v.*
C & C PLYWOOD CORP.

No. 53.  Argued November 15, 1966.—
Decided January 9, 1967.

*Daniel M. Friedman* argued the cause for petitioner. On the brief were *Solicitor General Marshall, Arnold Ordman, Dominick L. Manoli, Norton J. Come* and *Lawrence M. Joseph.*

*George J. Tichy* argued the cause and filed a brief for respondent.

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondent employer was brought before the National Labor Relations Board to answer a complaint that its inauguration of a premium pay plan during the term of a collective agreement, without prior consultation with the union representing its employees, violated the duties imposed by §§ 8 (a)(5) and (1) of the National Labor Relations Act.[1] The Board issued a cease-and-desist order, rejecting the claim that the respondent's action was authorized by the collective agreement.[2] The Court of Appeals for the Ninth Circuit refused, however, to enforce the Board's order. It reasoned that a provision in the agreement between the union and the employer, which "arguably" allowed the employer to institute the premium pay plan, divested the Board of jurisdiction to entertain the union's unfair labor practice charge. 351 F. 2d 224. We granted certiorari to consider a substantial question of federal labor law. 384 U. S. 903.

In August 1962, the Plywood, Lumber, and Saw Mill Workers Local No. 2405 was certified as the bargaining representative of the respondent's production and maintenance employees. The agreement which resulted from collective bargaining contained the following provision:

"Article XVII

"WAGES

"A. A classified wage scale has been agreed upon by the Employer and Union, and has been signed by the parties and thereby made a part of the

---

[1] National Labor Relations Act, as amended, §§ 8 (a)(5) and (1), 61 Stat. 140–141, 29 U. S. C. §§ 158 (a)(5) and (1).

[2] The NLRB's order directed respondent to bargain with the union upon the latter's request and similarly to rescind any payment plan which it had unilaterally instituted.

written agreement. The Employer reserves the right to pay a premium rate over and above the contractual classified wage rate to reward any particular employee for some special fitness, skill, aptitude or the like. The payment of such a premium rate shall not be considered a permanent increase in the rate of that position and may, at sole option of the Employer, be reduced to the contractual rate . . . ."

The agreement also stipulated that wages should be "closed" during the period it was effective [3] and that neither party should be obligated to bargain collectively with respect to any matter not specifically referred to in the contract.[4] Grievance machinery was established, but no ultimate arbitration of grievances or other disputes was provided.

Less than three weeks after this agreement was signed, the respondent posted a notice that all members of the

---

[3]                     "Article XVII

.                 .             .              .             .

"B. It is mutually agreed that the attached classified wage scale shall be effective upon the signing of this Working Agreement with wages closed for the term of that agreement. . . ."

[4]                     "Article XIX
            "WAIVER OF DUTY TO BARGAIN

"The parties acknowledge that during negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter of collective bargaining, and that the understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agree that the other shall not be obligated to bargain collectively with respect to any subject matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement."

"glue spreader" crews would be paid $2.50 per hour if their crews met specified biweekly (and later weekly) production standards, although under the "classified wage scale" referred to in the above quoted Art. XVII of the agreement, the members of these crews were to be paid hourly wages ranging from $2.15 to $2.29, depending upon their function within the crew.[5] When the union learned of this premium pay plan through one of its members, it immediately asked for a conference with the respondent. During the meetings between the parties which followed this request, the employer indicated a willingness to discuss the terms of the plan, but refused to rescind it pending those discussions.

It was this refusal which prompted the union to charge the respondent with an unfair labor practice in violation of §§ 8 (a)(5) and (1). The trial examiner found that the respondent had instituted the premium pay program in good-faith reliance upon the right reserved to it in the collective agreement. He, therefore, dismissed the complaint. The Board reversed. Giving consideration to the history of negotiations between the parties,[6] as well as the express provisions of the collective

---

[5] Workers in the three job classifications composing the glue spreader crews were to receive the following wages:

| | |
|---|---|
| Core Layer | $2.29/hour |
| Core Feeder | $2.24/hour |
| Sheet Turner | $2.15/hour |

[6] The trial examiner found that "quite some time prior" to the execution of the contract, the respondent's general manager had proposed an "incentive bonus system" within the department where the glue spreader crews worked. The union's representative, however, declared that the union would not agree to such a plan. Sometime later in the negotiations, the respondent again made reference to the fact that it was "giving thought" to incentive pay, but the trial examiner was unable to conclude that this reference was related to the premium pay provision that eventually appeared in the contract.

agreement, the Board ruled the union had not ceded power to the employer unilaterally to change the wage system as it had. For while the agreement specified different hourly pay for different members of the glue spreader crews and allowed for merit increases for "particular employee[s]," the employer had placed all the members of these crews on the same wage scale and had made it a function of the production output of the crew as a whole.

In refusing to enforce the Board's order, the Court of Appeals did not decide that the premium pay provision of the labor agreement had been misinterpreted by the Board. Instead, it held the Board did not have jurisdiction to find the respondent had violated § 8 (a) of the Labor Act, because the "existence . . . of an unfair labor practice [did] not turn entirely upon the provisions of the Act, but arguably upon a good-faith dispute as to the correct meaning of the provisions of the collective bargaining agreement . . . ." 351 F. 2d, at 228.

The respondent does not question the proposition that an employer may not unilaterally institute merit increases during the term of a collective agreement unless some provision of the contract authorizes him to do so. See *Labor Board* v. *J. H. Allison & Co.,* 165 F. 2d 766 (C. A. 6th Cir.), cert. denied, 335 U. S. 814. Cf. *Beacon Piece Dyeing Co.,* 121 N. L. R. B. 953 (1958).[7] The argument is, rather, that since the contract contained a provision which *might* have allowed the respondent to institute the wage plan in question, the Board was powerless to determine whether that provision *did* authorize

---

[7] For illustrations of the limited discretion which the Labor Act allows employers concerning the wages of employees represented by certified unions, see *Labor Board* v. *Katz,* 369 U. S. 736; *Labor Board* v. *Crompton-Highland Mills, Inc.,* 337 U. S. 217.

the respondent's action, because the question was one for a state or federal court under § 301 of the Act.[8]

In evaluating this contention, it is important first to point out that the collective bargaining agreement contained no arbitration clause.[9] The contract did provide grievance procedures, but the end result of those procedures, if differences between the parties remained unresolved, was economic warfare, not "the therapy of arbitration." *Carey* v. *Westinghouse Corp.*, 375 U. S. 261, 272. Thus, the Board's action in this case was in no way inconsistent with its previous recognition of arbitration as "an instrument of national labor policy for composing contractual differences." *International Harvester Co.*, 138 N. L. R. B. 923, 926 (1962), aff'd *sub nom. Ramsey* v. *Labor Board*, 327 F. 2d 784 (C. A. 7th Cir.), cert. denied, 377 U. S. 1003.[10]

The respondent's argument rests primarily upon the legislative history of the 1947 amendments to the Na-

---

[8] § 301, Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185.

[9] The Court of Appeals in this case relied upon its previous decision in *Square D Co.* v. *Labor Board*, 332 F. 2d 360. But *Square D* involved a collective agreement that provided for arbitration. See Note, Use of an Arbitration Clause, 41 Ind. L. J. 455, 469 (1966).

[10] See also *Cloverleaf Div. of Adams Dairy Co.*, 147 N. L. R. B. 1410, 1416 (1964), where the Board made the following observation to justify, in part, its decision to construe a labor contract in the course of an unfair labor practice proceeding:

". . . it affirmatively appears that neither party has even so much as sought to invoke arbitration. Nor is this a case involving an alleged unfair labor practice, the existence of which turns primarily on an interpretation of specific contractual provisions, unquestionably encompassed by the contract's arbitration provisions, and coming to us in a context that makes it reasonably probable that arbitration settlement of the contract dispute would also put at rest the unfair labor practice controversy in a manner sufficient to effectuate the policies of the Act." (Footnotes omitted.)

Cf. *Spielberg Mfg. Co.*, 112 N. L. R. B. 1080 (1955).

tional Labor Relations Act. It is said that the rejection by Congress of a bill which would have given the Board unfair labor practice jurisdiction over all breaches of collective bargaining agreements shows that the Board is without power to decide any case involving the interpretation of a labor contract. We do not draw that inference from this legislative history.

When Congress determined that the Board should not have general jurisdiction over all alleged violations of collective bargaining agreements [11] and that such matters should be placed within the jurisdiction of the courts,[12] it was acting upon a principle which this Court had already recognized:

> "The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them."

*Terminal Railroad Assn.* v. *Brotherhood of Railroad Trainmen,* 318 U. S. 1, 6. To have conferred upon the National Labor Relations Board generalized power to determine the rights of parties under all collective agreements would have been a step toward governmental regulation of the terms of those agreements. We view

---

[11] An earlier version of the Senate bill contained the following provision:

"Sec. 8. (a) It shall be an unfair labor practice for an employer—

   .      .      .      .

"(6) to violate the terms of a collective-bargaining agreement or the terms of an agreement to submit a labor dispute to arbitration . . . ." Section 8 (b)(5) of the same bill imposed a similar limitation upon labor organizations. S. 1126, 80th Cong., 1st Sess., 1 Legis. History of LMRA 109–111, 114. Neither of these provisions was in the bill enacted into law.

[12] § 301, Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185.

Congress' decision not to give the Board that broad power as a refusal to take this step.[13]

But in this case the Board has not construed a labor agreement to determine the extent of the contractual rights which were given the union by the employer. It has not imposed its own view of what the terms and conditions of the labor agreement should be. It has done no more than merely enforce a statutory right which Congress considered necessary to allow labor and management to get on with the process of reaching fair terms and conditions of employment—"to provide a means by which agreement may be reached." The Board's interpretation went only so far as was necessary to determine that the union did not agree to give up these statutory safeguards. Thus, the Board, in necessarily construing a labor agreement to decide this unfair labor practice case, has not exceeded the jurisdiction laid out for it by Congress.

This conclusion is reinforced by previous judicial recognition that a contractual defense does not divest the Labor Board of jurisdiction. For example, in *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, the legality of an employer's refusal to reinstate strikers was based upon the Board's construction of a "no strike" clause in the labor agreement, which the employer contended allowed it to refuse to take back workers who had walked out in protest over its unfair labor practice. The strikers applied to the Board for reinstatement and back

---

[13] Congress was also concerned with the possibility of conflicting decisions that would result from placing all questions of contract interpretation before both the Board and the courts. See 93 Cong. Rec. 4033, 2 Legis. History of LMRA 1043 (remarks of Senator Murray); 93 Cong. Rec. 6443, 2 Legis. History of LMRA 1539. But such a possibility does not arise in a case like the present one, since courts have no jurisdiction to enforce the union's statutory rights under §§ 8 (a)(5) and (1).

pay.  In giving the requested relief, the Board was forced to construe the scope of the "no strike" clause.  This Court, in affirming, stressed that the whole case turned "upon the proper interpretation of the particular contract . . . ."  350 U. S., at 279.  Thus, *Mastro Plastics* stands squarely against the respondent's theory as to the Board's lack of power in the present case.[14]

If the Board in a case like this had no jurisdiction to consider a collective agreement prior to an authoritative construction by the courts, labor organizations would face inordinate delays in obtaining vindication of their statutory rights.  Where, as here, the parties have not provided for arbitration, the union would have to institute a court action to determine the applicability of the premium pay provision of the collective bargaining agreement.[15]  If it succeeded in court, the union would then

---

[14] In *Mastro Plastics Corp.* v. *Labor Board*, 350 U. S. 270, the employer was charged with a violation of §§ 8 (a)(1), (2) and (3), and not with a failure to bargain.  But nothing is suggested that would justify distinguishing the case on that ground.

[15] The precise nature of the union's case in court is not readily apparent.  If damages for breach of contract were sought, the union would have difficulty in establishing the amount of injury caused by respondent's action.  For the real injury in this case is to the union's status as bargaining representative, and it would be difficult to translate such damage into dollars and cents.  If an injunction were sought to vindicate the union's contractual rights, the problem of the applicability of the Norris-LaGuardia Act would .have to be faced.  A federal injunction issuing from a court with § 301 jurisdiction might be barred by § 7 of that Act.  See *International Union of Electrical Workers* v. *General Electric Co.*, 341 F. 2d 571 (C. A. 2d Cir.); *Local No. 861* v. *Stone & Webster Corp.*, 163 F. Supp. 894 (D. C. W. D. La.).  Cf. *Sinclair Refining Co.* v. *Atkinson*, 370 U. S. 195; *Publishers' Assn.* v. *New York Mailers' Union*, 317 F. 2d 624 (C. A. 2d Cir.), cert. granted, 375 U. S. 901, judgment vacated in part for dismissal as moot, 376 U. S. 775.  Whether a state injunction might be similarly barred in suits governed by federal labor law, *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S. 95, is an

have to go back to the Labor Board to begin an unfair labor practice proceeding. It is not unlikely that this would add years to the already lengthy period required to gain relief from the Board.[16] Congress cannot have intended to place such obstacles in the way of the Board's effective enforcement of statutory duties. For in the labor field, as in few others, time is crucially important in obtaining relief. *Amalgamated Clothing Workers* v. *Richman Bros. Co.,* 348 U. S. 511, 526 (dissenting opinion).

The legislative history of the Labor Act, the precedents interpreting it, and the interest of its efficient administration thus all lead to the conclusion that the Board had jurisdiction to deal with the unfair labor practice charge in this case. We hold that the Court of Appeals was in error in deciding to the contrary.

The remaining question, not reached by the Court of Appeals, is whether the Board was wrong in concluding that the contested provision in the collective agreement gave the respondent no unilateral right to institute its premium pay plan. In reaching this conclusion, the Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free collective bargaining. We cannot disapprove of the Board's approach. For the law of labor agreements cannot be based upon abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying that context. See Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1 (1958): Nor can we say that the Board was

---

open question. See *Charles Dowd Box Co.* v. *Courtney,* 368 U. S. 502, 514, n. 8. Thus, it may be that the only remedy in court which would be available to the union would be a suit for a declaratory judgment, assuming such a suit in these circumstances would be maintainable under state or federal law.

[16] The instant charge, for example, was filed July 31, 1963.

wrong in holding that the union had not forgone its statutory right to bargain about the pay plan inaugurated by the respondent. For the disputed contract provision referred to increases for "particular employee[s]," not groups of workers. And there was nothing in it to suggest that the carefully worked out wage differentials for various members of the glue spreader crew could be invalidated by the respondent's decision to pay all members of the crew the same wage.[17]

The judgment is accordingly reversed and the case is remanded to the Court of Appeals with directions to enforce the Board's order.

*Reversed and remanded.*

---

[17] The respondent points to two other labor contracts in its area to support its version of the provision here in question, but those agreements, even if relevant, fall short of substantiating its position. In one, a premium was paid to members of two-man crews who accomplished prescribed production goals. But the respondent does not show that this premium leveled a wage differential set up by the collective bargaining agreement. In the other, a lumber company's head sawyer received an hourly bonus if the plant exceeded a certain monthly output.