NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN & HELPERS, LOCAL UN-
ION NO. 631, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN &
HELPERS OF AMERICA, Respondent.

No. 21523.

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1968.

Allison W. Brown, Jr. (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Roy O. Hoffman, Regional Director, N.L.R.B., San Francisco, Cal., for petitioner.

Robert L. Reid (argued), Las Vegas, Nev., Wm. F. Spalding (argued), of Gibson, Dunn & Crutcher, Los Angeles, Cal., Carroll, Davis, Burdick & McDonough, San Francisco, Cal., for intervenor. for respondent.

Before HAMLEY and HAMLIN, Circuit Judges, and PLUMMER, District Judge *.

HAMLEY, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order of April 12, 1966, issued against respondent (Teamsters) in an unfair labor practice proceeding. The Board decision and order are reported at 157 NLRB 1621.

The proceeding involves a dispute between Teamsters and the International Brotherhood of Electrical Workers, Local 357 (Electricians) concerning work assignments at the Atomic Energy Commission's Nevada Test Site. This site consists of more than 1500 square miles and is sometimes referred to as Mercury, a designation deriving from the townsite of that name which is the point of entry to the test site from Las Vegas, Nevada.

The charging party, and intervenor herein, is Reynolds Electrical & Engineering Co., Inc. (REECO), the prime contractor for this AEC project.

On February 11, 1942, which was nine years before the AEC began nuclear testing at the Nevada Test Site, the parent International unions of the disputing locals entered into an agreement governing certain work assignments. In particular, the agreement allocated the operation of vehicles delivering electrical materials to employees represented by the Teamsters. The operation of vehicles used for electrical construction work, maintenance work, or electrical repair work was allocated to employees represented by the Electricians. The agreement sets out in some detail the tests to be applied in determining whether a particular vehicle operation falls into one category or the other.

Nuclear testing at the Nevada Test Site began in 1951, with the Nevada Company as prime contractor. On February 27, 1952, while that company was still the prime contractor, a jurisdictional dispute arose between the Teamsters and the Electricians over the staffing of a warehouse and yard, located at Mercury, used exclusively to store electrical materials. A further dispute between the same parties involved the hauling of such materials from the warehouse to the points of use.

William F. Carter, secretary-treasurer of the Teamsters, and Ralph A. Leigon, business manager of the Electricians, sought to resolve these disputes by entering into the so-called "Carter-Leigon Agreement" of February 29, 1952. In essence, the Carter-Leigon Agreement incorporates and adapts the terms of the 1942 agreement to the 1952 disputes. REECO became the prime contractor in December, 1952. While it was not a formal party to the Carter-Leigon Agreement, it abided by its terms.

Between 1951 and October, 1958, nuclear testing at the Nevada Test Site was conducted above ground. A moratorium on all nuclear testing was imposed from October, 1958 until September, 1961. Since 1961, all testing has been conducted underground, necessitating a change in the nature of REECO's operations.

During the period of atmospheric testing, the wide range destructive effect of the tests precluded the development of any permanent work buildings near the testing. With the termination of atmospheric testing, REECO developed forward staging compounds proximate to the points of testing. These forward compounds are, in turn, subdivided into smaller compounds each occupied by a specific craft. Among other things, the forward compounds contain facilities for the fabrication or assembly of materials and structures prior to their transportation for use underground in well-holes and tunnels.

The proceeding before us involves jurisdictional disputes between the Teamsters and Electricians concerning two kinds of work. The first pertains to the

* The Honorable Raymond E. Plummer, United States District Judge for the District of Alaska, sitting by designation.

staffing of the forward electrical compounds. The men assigned there unload electrical materials and supplies and check, tally, place or "spot" these materials within the compound. The second kind of work involved in the jurisdictional dispute has to do with the loading of electrical materials and supplies into vehicles at the forward electrical compounds and the hauling to and unloading of such materials at the points of use.

On March 30, 1964, the Teamsters referred the disputes to the Joint Conference Board (AGC Board) for compulsory arbitration. This action was taken pursuant to grievance procedures provided for in a collective bargaining agreement between the Teamsters and the Nevada Chapter, Associated General Contractors of America, Inc., REECO being a signatory thereto. The Electricians were not a party to this agreement and therefore were not represented in this arbitration proceeding. The AGC Board award was issued on April 30, 1964 and clarified on May 6, 1964. It was favorable to the Teamsters on the hauling dispute, but was adverse to them on the compound staffing dispute.

On May 4, 1964, the Electricians, following grievance procedures provided for in a collective bargaining agreement between the Electricians and the Southern Nevada Chapter of the National Electrical Contractors Association (NECA), REECO being a signatory to that agreement, referred these same jurisdictional disputes to the NECA Joint Conference Committee.

On May 5, 1964, REECO filed a charge with the Board alleging that the Teamsters had violated section 8(b) (4) (D) of the National Labor Relations Act, as amended (Act), 73 Stat. 525, 29 U.S.C. § 158(b) (4) (D) (1964). This section relates to jurisdictional disputes involving work assignments. REECO filed an amended charge on May 11, 1964. Beginning on the latter date, the Teamsters began resorting to self-help in the form of refusals by them to perform assigned work, a strike, and picketing at the entrance to the Nevada Test Site.

On May 13, 1964, the NECA Joint Conference Committee issued its report. It held that REECO's assignment of the work in dispute to the Electricians was proper. The Committee further concluded that if REECO complied with the AGC Board award, it would violate the contract between the Electricians and the NECA Contractors, and would not conform to the long-established practice in the area.

On May 21, 1964, the Teamsters filed a complaint against REECO in the United States District Court for the District of Nevada (case No. 666), seeking enforcement of the AGC Board's award and declaratory relief based on the Teamsters' contract with REECO. REECO answered and the Electricians and the Board intervened. On June 5, 1964, in another federal district court action filed by the Board in the same court (case No. 669), the Teamster picketing at the Nevada Test Site was enjoined.

On the basis of REECO's charge and amended charge, the Board, on May 27, 1964, instituted a proceeding under section 10(k) of the Act, 61 Stat. 146, 29 U.S.C. § 160(k), to hear and determine the dispute out of which the asserted unfair labor practice arose. On December 16, 1964, the Board issued its decision and determination of dispute in that proceeding. It found that the disputed work should be awarded to employees represented by the Electricians. Consistent with this finding, the Board held that the Teamsters were not lawfully entitled to force REECO to assign the work to employees represented by the Teamsters.

The Teamsters informed the Board that they would not voluntarily comply with the Board's determination in the section 10(k) proceeding. Thereupon an unfair labor practice proceeding was instituted on January 26, 1965, the charge being that the Teamsters had violated section 8(b) (4) (D) of the Act. On March 5, 1965, in case No. 666, the

district court entered an order staying court action pending final disposition of the Board's unfair labor practice proceeding.

The Board issued its decision and order on April 12, 1966. In agreement with the trial examiner, the Board concluded that one object of the Teamsters' coercive action beginning May 11, 1964 was to affect the staffing of the forward electrical compounds. According to the Board, the Teamsters' specific objective in this regard was to force REECO either to assign Teamster employees to these compounds on a ratio of one to one with other craftsmen, or to require REECO to staff these installations exclusively with Teamster employees. The Board further determined, in this decision and order, that another object of the Teamsters' coercive conduct was to force REECO to assign Teamster employees to the work of transporting electrical supplies from forward electrical compounds to points of use.

The Board ruled that, having engaged in the described conduct with these objectives, the Teamsters violated section 8(b) (4) (D) of the Act. The Board order requires the Teamsters to cease and desist from these unfair labor practices with respect to REECO or any other person. The order also directs the Teamsters to post appropriate notices. The Teamsters failed to observe and comply with the Board decision and order of April 12, 1966, whereupon the Board instituted this enforcement proceeding.

In resisting enforcement of the Board order, the Teamsters do not contest, on the merits, the Board's determination of the work-assignment issues. Instead, they argue that, under the circumstances of this case, jurisdiction to determine the work-assignment issues was exclusively vested in the district court, in case No. 666, and that therefore the Board should not have instituted, or rendered decisions in, the section 10(k) and unfair labor practice proceedings.

As originally instituted on May 21, 1964, the Teamsters' district court action against REECO was predicated upon section 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U.S.C. § 185 (1964), and the United States Arbitration Act, 9 U.S.C. § 1 et seq. (1964). In their complaint, the Teamsters undertook to state two claims, both based upon the then-existing AGC collective bargaining agreement referred to above. In their first claim, the Teamsters sought specific performance, by REECO, of the Joint Conference Board award of April 30, 1964, made pursuant to the compulsory arbitration provisions of the AGC agreement. In their second claim, the Teamsters sought declaratory relief as to the construction and validity of that award and with regard to the meaning of the AGC agreement.

While this federal suit was commenced sixteen days after REECO filed its May 5, 1964 charge with the Board, it was begun prior to the commencement of the Board's section 10(k) proceeding. Relying upon this priority, known to the Board, the Teamsters assert that the jurisdiction thus acquired by the district court to entertain a suit for violation of a collective bargaining agreement, and for a determination of the meaning and enforcement of an arbitration agreement, precluded the Board from exercising jurisdiction in its section 10(k) and unfair labor practice proceedings, thereafter instituted, involving the same controversy.[1]

1. At a later date which we cannot ascertain from the record, but which was probably not earlier than December, 1964 (since the answer thereto was served on January 4, 1965), the Teamsters filed an amended complaint in which reference to the Arbitration Act was dropped, and a reference to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1964), was added. In this amended complaint the first two claims are identical with those of the original complaint. But a third claim was added, directed not only to REECO, but also to the Electricians, who had intervened in the suit. In this third claim, the Teamsters sought for the first time declaratory relief as to the rights, duties and obligations of the

■ In advancing this argument, the Teamsters are immediately met by the circumstance that the Electricians Union was not party to the collective bargaining agreement and its arbitration provisions which are the subject matter of that federal suit. This being the case, it would appear that the district court could not grant total relief and therefore should not have exclusive jurisdiction.

Seeking to overcome this difficulty by what seems to us a rather intricate line of reasoning, the Teamsters urge that the suit really involves an effort to enforce a "tri-partite" agreement between the Teamsters, the Electricians and REECO, namely, the 1952 Carter-Leigon Agreement.

If the real subject matter of the federal suit, as initially instituted, is the Carter-Leigon Agreement between the Teamsters and the Electricians, and if, under the circumstances, REECO should be regarded as a party thereto or for some other reason obligated thereunder, and if the Carter-Leigon Agreement is relevant to the work-assignment issues here in question, then the district court probably could deal with the rights of all parties to the dispute and grant adequate relief.

■ In our opinion, however, the real subject matter of the federal action, as originally instituted, is not the Carter-Leigon Agreement, but the AGC contract to which the Electricians are not a party, and the Joint Conference Board award of April 30, 1964, resulting from arbitration proceedings, authorized by the AGC contract, in which proceedings the Electricians had no part. So understood, the fact that the Joint Conference Board

considered the Carter-Leigon Agreement in making its award is immaterial insofar as the proper characterization of the suit, as originally instituted, is concerned.

Moreover, as we read this record, the Carter-Leigon Agreement is not relevant to the issue of how the forward electrical compounds are to be staffed. In addition, concerning the second issue, as to who is entitled to deliver supplies from the electrical compounds to the points of use, the agreement, if relevant at all, supports the Electricians rather than the Teamsters. The Board so determined in the section 10(k) proceeding on findings which the Teamsters do not here challenge.

■ But, in any event, even if it be assumed that the subject matter of the suit, as originally instituted, was such that the district court could give complete relief, we are of the view that, under section 301, the Board had at least concurrent jurisdiction (Smith v. Evening News Association, 371 U.S. 195, 197, 83 S.Ct. 267, 9 L.Ed.2d 246) and the district court could, as it did, hold its proceeding in abeyance so that the issues could be determined by the Board. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local Union No. 525, Las Vegas, Nev., (AFL–CIO) v. Foley, 9 Cir., 380 F.2d 474, 476.

■ Section 10(k) specifically empowers the Board to hear and determine a dispute out of which an asserted section 8(b) (4) (D) unfair labor practice has arisen.[2] There is no dispute about

parties under the Carter-Leigon Agreement, and specific performance of the duties and obligations declared. Since the amended complaint was filed several months after the Board instituted its section 10(k) proceeding, we think the question of the Board's jurisdiction to proceed therein must be judged with reference only to the allegations of the original complaint.

2. Under section 10(k), the Board may not exercise such jurisdiction if, within ten days after notice that such a charge has been filed, the parties submit to the Board satisfactory evidence that they have adjusted it, or agreed upon methods for the voluntary adjustment of the dispute. The Teamsters argue that the 1952 Carter-Leigon Agreement constituted a private adjustment of the juris-

the Teamsters having resorted to conduct falling within the proscription of section 8(b) (4) (D). This statutory provision forbids a union from encouraging a strike or engaging in other coercive conduct where an object is to force or require an employer to assign particular work to employees in a particular labor organization, trade, craft or class rather than to employees in another labor organization, trade, craft or class, with an exception not here material.

■ The broad scope of the Board's functioning in section 10(k) proceedings is outlined in N.L.R.B. v. Radio and Television Engineers Union Local 1212 (commonly known as the C.B.S. case), 364 U.S. 573, 579, 583, 81 S.Ct. 330, 5 L.Ed.2d 302. Under this section, Congress has committed to the Board a task which requires the exercise of a wide degree of discretion and its special expertise. Among other things, the Board considers the skills and work involved, certifications by the Board, company and industry practice, agreements between unions, and between employers and unions, the awards of arbitrators, the assignments made by the employer, and the efficient operation of the employer's business. International Association of Machinists, Lodge 1743, 135 NLRB 1402, 1410–1411. See also, N.L.R.B. v. International Longshoremen's & Warehousemen's Union, 9 Cir., 378 F.2d 33, 36.

■ There is a great deal of argument in the briefs concerning the power of the Board to decide questions involving the interpretation of a labor contract in the course of dealing with an unfair labor practice charge. N.L.R.B. v. C. & C. Plywood Corp., 385 U.S. 421, 427, 428, 87 S.Ct. 559, 17 L.Ed.2d 486, makes it clear, however, that the Board has such authority. See also, N.L.R.B. v. Honolulu Star-Bulletin, Inc., 9 Cir., 372 F.2d 691, 692–693.

■ The Teamsters also argue that, even if district court jurisdiction was not exclusive, the Board should have suspended or dismissed its section 10(k) proceeding until the district court case had been determined. The Teamsters' reasoning is that a district court determination should first have been made because if the court found that under area practice or the Carter-Leigon Agreement, the disputed work tasks have been preempted in favor of the Teamsters, the latter's coercive activity would not have been an unfair labor practice under section 8(b) (4) (D).

The issues having been properly presented in a section 10(k) proceeding, the Board was under no duty to step aside to await the outcome of the court action. As indicated above, the Board was fully empowered to evaluate the area practice and construe the Carter-Leigon Agreement in resolving the unfair labor practice charge.

■ The Teamsters predicate an independent ground for resisting enforcement of the Board's cease and desist order on the established principle that a section 10(k) proceeding must be triggered by a strike or threat of strike in violation of section 8(b) (4) (D). See Carey v. Westinghouse Electric Corp., 375 U.S. 261, 263–264, 84 S.Ct. 401, 11 L.Ed.2d 320.

The Teamsters assert that REECO's original charge, filed with the Board on May 5, 1964, and its amended charge filed May 11, 1964, pertained only to the coercive action taken by the Teamsters between April 22 and 28, 1964, and further assert that such action had to do only with the composite staffing of the electrical compounds. The Teamsters urge that their coercive action from May 11 to June 1, 1964, undertaken with reference to the hauling dispute was thus not included in REECO's charge. Arguing that a section 10(k) proceeding must

dictional dispute within the meaning of this section 10(k) exception. However, on the basis of the statutory language, we conclude that the private adjustments referred to in this exception are ones

entered into by the parties for the purpose of resolving the particular dispute which is the basis of the unfair labor practice charge.

be initiated by a charge focusing upon unfair labor practices which have already occurred, the Teamsters contend that the Board was therefore without jurisdiction, at least insofar as the hauling dispute is concerned.

The record does not support the Teamsters' assertion that all of the coercive conduct prior to the filing of REECO's charges was solely in support of the composite staffing issue. A strike-request telegram, dated April 22, 1964, sent by a Teamster official to the Joint Council of Teamsters and Teamster International officers, complained of REECO "using people other than Teamsters to handle and haul material." Likewise, when a Teamster official submitted grievances to the AGC Board on March 30, 1964, he did not attempt to separate the two disputes. Instead, his reference was to "handling, warehousing, and transporting" of materials. In addition, REECO's amended charge filed with the Board on May 11, 1964, referred to the Teamsters' efforts to force and require REECO " * * * to assign work of (a) unloading the material * * * and (b) the transporting of such materials from the point of such unloading * * * to [the] point of installation. * * * "

However, assuming that the record did not support the finding that the hauling dispute was raised by the Teamsters' April 22–28 conduct, the Board was nevertheless entitled to consider the dispute in its section 10(k) proceedings. This is true because the work of unloading, checking and placing of electrical materials in the forward compounds is of the same class, and related to, the work of transporting these same materials from the forward compounds to the points of use. See N.L. R.B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243.

Finally, the Teamsters argue that the cease and desist order is excessively broad because it is not specific with reference to person, time or place, and because the phrase "or any other person" is inserted whenever REECO is mentioned in the order.

The order expressly relates to the disputes in question at the Nevada Test Site, and the broad form of the order is supported by the facts in the record. The Board asserts, and it is bound thereby, that the addition of the words "any other person" simply means that the Teamsters cannot use coercive and unlawful means to force any successor employer to REECO at the Nevada Test Site to assign the work in dispute to the Teamsters. Under the circumstances of this case, we hold the order to be in proper form.

The Board order will be enforced.