**CAPITOL CITY LUMBER COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 82–1682, 82–1850.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1983.

Decided Nov. 11, 1983.

Certiorari Denied Feb. 21, 1984. See 104 S.Ct. 1291.

Thomas A. Bengtson, argued, Hubbard, Fox, Thomas, White & Bengtson, Lansing, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Robert Tendrich, argued, N.L.R.B., Washington, D.C., for respondent.

Before MARTIN and CONTIE, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PER CURIAM.

Capitol City Lumber Company petitions for review of an order of the National Labor Relations Board requiring Capitol City to make certain payments into pension and welfare benefit funds maintained for the benefit of its employees, members of Teamsters Union, Local 580. 263 N.L.R.B. 102. The Board, in turn, cross-applies for enforcement of its order pursuant to 29 U.S.C. § 160(e).

In the spring of 1979, Capitol City and Local 580 entered into negotiations for a new contract covering the company's employees. On May 25, the company and the union reached agreement on the terms of that contract. The new contract was to be effective for one year, beginning May 1, 1979, and would be automatically renewed each year unless either party gave notice sixty days prior to the renewal date. Article XIX of the agreement, however, com-

mitted the company to making contributions to the employee pension and welfare benefit funds for a three-year period.[1]

The employees ratified the new agreement immediately but the contract was not submitted to the company president, Olson, for signature until December 14, 1979, because of Olson's ill health. At that time, Olson expressed misgivings about making a three-year commitment to the pension and welfare funds in what was otherwise a one-year renewable contract. Olson was also concerned that his employees did not appreciate the cost implications of the Company's fund contributions. The union representative, Mr. Cooper, explained that a three-year commitment was necessary to meet the participation requirements of the funds' managers. Cooper agreed to draw up an additional letter of understanding to clarify the situation.[2] The resulting letter confirmed that a three-year commitment was required to participate in the funds. The letter also spelled out the per-employee cost for the company's first-year contributions to the funds and stated that future wage agreements must take into account the cost of fund payments. This letter of understanding was incorporated into the separate fund participation agreements, and they, along with the collective bargaining agreement itself, were signed by Olson and Cooper on December 30, 1979.

The collective bargaining agreement was renewed May 1, 1980 for another year. However, the company did not increase its payments to the welfare and pension funds as called for in Article XIX of the collective

bargaining agreement but kept them at the previous year's level. The agreement was not renewed on May 1, 1981, and the company ceased making contributions to the funds altogether. The union filed an unfair labor practice charge, claiming that the company had violated sections 8(a)(5) and (1) of the Act by failing to make contributions to the funds as required by the agreement. The administrative law judge, upheld by the Board, found a violation and ordered the company to remit to the funds all amounts required by Article XIX for the three-year period from May 1, 1979 to April 30, 1982. We agree.

 The company's first allegation on review is that the Board lacked jurisdiction to hear the union's complaint. The Board's jurisdiction is limited to resolving disputes involving unfair labor practices. Section 10(a) of the Act, 29 U.S.C. § 160(a). The Board does not have the authority to police collective bargaining agreements. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 427–28, 87 S.Ct. 559, 563–64, 17 L.Ed.2d 486 (1967). Here, the company argues that the union alleges nothing more than a violation of a collective bargaining agreement, and, therefore, the union's remedies are limited to the grievance procedure established by the agreement or a breach of contract suit in the courts. However, it is well established that the Board does have jurisdiction to resolve contractual disputes, including those involving a collective bargaining agreement, whenever those disputes are central to the disposition of an unfair labor practice complaint. *Id.* Here, the unfair

---

1. Article XIX of the contract provided, in relevant part, that the Company would make the following contributions to the funds per week for each employee:

| Welfare Fund | Pension Fund |
| --- | --- |
| $25 effective May 1, 1979 | $21 effective May 1, 1979 |
| $28 effective April 1, 1980 | $24 effective May 1, 1980 |
| $31 effective April 1, 1981 | $31 effective May 1, 1981 |

2. The letter of understanding reads in its entirety as follows:

In the May 1, 1979 contract negotiations in order to remain with the Michigan Conference of Teamsters Welfare Fund UE Plan, and Central States Southeast and Southwest

Areas Pension Plan, a thirty-six (36) month commitment was required due to plan regulations.

The money package negotiated was sixty-seven and one half cents (67½) per hour providing forty-five cents (45 cents) per hour applied to wages and the remaining twenty-two and one half cents (22½) per hour applied as contributions to maintain the Health and Welfare and Pension Plans from May 1, 1979 through April 30, 1980.

In order to maintain the Health and Welfare and Pension plans from May 1, 1980 it will be necessary to deduct the cost from the money negotiated in future negotiations.

labor practice is the company's failure to bargain over changes in the terms and conditions of employment—the reductions in payments to the pension and welfare funds—in violation of sections 8(a)(5) and (1) of the Act. *See Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978). Because the contractual violation is identical to the unfair labor practice, the Board has jurisdiction to decide both.

The Supreme Court has already upheld the Board's jurisdiction in a very similar case, *NLRB v. C & C Plywood, supra.* There, the company attempted to raise the wages of certain workers without consulting the union and in violation of the wage scale established in the collective bargaining agreement. Capitol City attempts to distinguish this case on two grounds: (1) the bargaining agreement in *C & C Plywood* had no arbitration provision, and (2) unlike the present case, there was no adequate remedy available to the union by suit in federal or state court. The subsequent case of *NLRB v. Strong,* 393 U.S. 357, 361, 89 S.Ct. 541, 544–45, 21 L.Ed.2d 546 (1969), however, clearly refutes both arguments. In *Strong,* the court said:

> [T]he Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract. [citations omitted.]

Finally, the Company argues that the Board's interpretation of the case law would convert any violation of the collective bargaining agreement into an unfair labor practice and thereby allow the Board to police collective bargaining agreements, a practice which the Congress has expressly refused to sanction. The company's fears are not well founded. Most disputes over interpretation of collective bargaining agreements, such as the termination of an employee in alleged violation of a "just cause" discharge requirement, simply do not rise to the level of an unfair labor practice.

Moreover, even those violations of an agreement which could be characterized as unfair labor practices are usually resolved in the arbitration/grievance procedure established by that agreement. The Board has a long history of deferring to the arbitration process both before and after an arbitration award has been made. *See Speilberg Mfg. Co.,* 112 N.L.R.B. 1080 (1955); *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971). However, the Board has made it clear that when, as here, the arbitral machinery is no longer available to resolve a dispute because the time limit for filing a grievance has expired and the adverse party will not waive the timely filing requirement, it will assert its jurisdiction. *Detroit Edison Co.,* 206 N.L.R.B. 898 (1973). Capitol City has little cause to complain when its own actions are responsible for the failure of the arbitration procedure.

■ Moving to the merits of the case, the company argues that the Board's interpretation of the letter of understanding is not supported by substantial evidence because the Board failed to follow the maxim that an ambiguous contract is construed most strongly against the party who drafted it. Had the Board done this, argues the company, it would have been forced to credit the testimony of president Olson that the letter was intended to limit to one year the company's commitment to the pension and welfare funds. We disagree. This maxim is a strategy of last resort to be used only after all other interpretative guides have been exhausted and ambiguity still remains. No such impasse was reached in this case. The Board, relying on the principle that parts of the same contract are to be construed so as to be consistent with each other, found that the letter of understanding was a response to Olson's concern that the employees understand the costs of the settlement and not an attempt to alter the company's three-year commitment to the funds. There is substantial evidence in the record to support this finding, including the testimony of Cooper, the union representative, and we will not disturb it.

Finally, the company argues that the remedy which the Board ordered was too broad. The Board required the company to remit to the pension and welfare funds all amounts due according to Article XIX from May 1, 1979 to April 30, 1982. The company argues that since there was no contract in effect between the parties for the last year, the Board had no authority to order it to make contributions to the funds. The company's argument is without merit. While the rest of the collective bargaining agreement expired on April 30, 1981, the commitment to the funds remained in effect. Therefore, the company owed back payments to the funds and the Board was empowered to order them paid.

Accordingly, the order of the Board is enforced.