**LOCAL UNION NO. 639, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, INC., Plaintiff,**

v.

**JACOBS TRANSFER COMPANY, INC., Defendant.**

**Civ. A. No. 74–1568.**

United States District Court, District of Columbia.

Jan. 30, 1976.

---

126

Solaman G. Lippman, Thomas J. Hart, Washington, D. C., for plaintiff.

Charles P. O'Connor, Washington, D. C., for defendant.

Abigail Cooley, Washington, D. C., for defendant intervenor N.L.R.B.

John V. Long, Washington, D. C., for defendant intervenor Daniel George.

BRYANT, District Judge.

## MEMORANDUM

This action is now before the Court on cross motions for summary judgment and Defendant-Intervenor's alternative motion to dismiss. The action is brought by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 639, to enforce two arbitration awards pursuant to Section 301 of the Labor Management Relations Act (29 U.S.C. § 185).

### SUMMARY OF FACTS

Plaintiff International Brotherhood of Teamsters, Chauffeurs, Warehousemen

and Helpers of America, Local 639 (hereinafter "Local 639") is the exclusive bargaining representative for all driver employees employed by Defendant Jacobs Transfer Company, Inc. ("the Company") in the Washington Metropolitan Area. Plaintiff and Defendant are both parties to a collective bargaining agreement known as the National Master Freight Agreement and Maryland-District of Columbia City Pick-Up and Delivery Supplemental Agreement.

Defendant-Intervenor Daniel George is an employee of Defendant Jacobs Transfer and a member of Local 639. As a result of George's discharge from Jacobs Transfer, Defendant-Intervenor National Labor Relations Board (hereinafter "the Board") found that the Company had committed an unfair labor practice and ordered that George be reinstated with backpay. It was impossible to reinstate George to his former job since the "Ardmore" terminal where he had worked had subsequently been closed. Consequently the Company offered George reinstatement at its facility in Baltimore.

George maintained that the offer violated his seniority rights, although it was the same offer he would have received had he not been discharged in the first place. George filed a formal grievance maintaining that his seniority rights required that he be offered employment in one of the Company's facilities in the Washington Metropolitan Area. The Eastern Conference Area Committee[1] rejected George's arguments and upheld the Baltimore reinstatement as proper.

The Board subsequently notified the Company that the transfer offer was not adequate compliance with its order. After negotiations, George and the Company entered into a compliance agreement which provided George with reinstatement in a District of Columbia facility (in direct contradiction to the arbitration decision). George's reinstatement displaced another employee. The union then filed a grievance on behalf of this "bumped" member and others with seniority rights equal to those of George who had not been given a similar transfer option. The Joint Maryland-District of Columbia Area Committee[1] upheld Local 639's claim and reaffirmed the earlier arbitration award that found George's proper place of reinstatement was Baltimore. Local 639 then brought this action to enforce the decisions.

## BACKGROUND

Daniel George began working for Jacobs Transfer, Inc. on August 11, 1966 at its Ardmore (Maryland) Terminal. He was employed there continuously until he was discharged for "disloyalty" on September 24, 1971. George's alleged "disloyalty" consisted principally of his distribution of a pamphlet charging that Local 639's President, Frank DeBrouse, and the then-vice-president and general manager of Jacobs, James Mills (formerly a Local 639 business agent), had combined in opposition to the interests of the union's members. In addition, George had organized a Committee of Reform within Local 639, filed grievances against the company for not enforcing seniority and starting time rules as well as other contract provisions, and organized a slate of candidates to challenge incumbent union leadership.

George was discharged from his job without being given the ten-day notice required by the collective bargaining agreement. George filed a grievance and requested neutral arbitration by a disinterested third party. He stated that he would not be bound by a decision of the arbitration board, the Maryland-District of Columbia Joint Area Committee, since he believed that both its labor and management members were united in interest against him. The Committee refused to refer the matter to a neutral arbitrator and upheld the discharge.

George had also filed unfair labor practice charges against both Jacobs and Local 639 with the National Labor Rela-

---

1. The arbitration panel designated by the collective bargaining agreement to hear such disputes.

tions Board. George alleged that he had been discriminatorily terminated from his employment due to his internal union activities and that plaintiff Local 639 had attempted to cause George's employer to discriminate against him. The Board dropped the charges against the union. On January 11, 1973, in *Jacobs Transfer, Inc.* 201 N.L.R.B. 210, the Board found that the Company had unlawfully discharged George and ordered Jacobs to offer him "immediate and full reinstatement to his former job, without prejudice to his former rights or privileges, and to make him whole for any loss of earnings suffered as a result of the discrimination against him."

It was impossible to reinstate George in his "former job" since three months prior to the order Jacobs had permanently closed its terminal in Ardmore, Maryland, where George had worked.

Prior to closing its Ardmore facility, Jacobs Transfer had applied to the Joint Maryland-District of Columbia Area Committee for approval of a "change of operations" in order to transfer work being done at Ardmore to its Baltimore, Maryland terminal. In its statement before the Joint Committee, Jacobs indicated that its work force at the Ardmore facility varied from 8 to 12 employees and that it anticipated that the change of operations would require that three Ardmore employees be transferred to the Baltimore terminal. The transfer was approved by the Committee.

The change-of-operations approval called for offering employment in any new work generated in Baltimore, as a result of the transfer, to former Ardmore employees in the order of their seniority. (Five employees were transferred to the Baltimore facility instead of the anticipated three.) Employees who elected to transfer had their seniority dove-tailed into the seniority list at the Baltimore terminal. Those who elected not to transfer were placed on lay-off status at Ardmore, while others who desired to transfer but who did not have sufficient seniority to obtain an available position in Baltimore were similarly placed on lay-off status in Baltimore.

Neither of the groups of laid-off employees were offered transfers to any other facilities of the Company.

In an attempt to comply with the Board's reinstatement order, Jacobs offered to reinstate Daniel George at its Baltimore terminal. (George had greater seniority than two of the five transferred employees, and therefore would have qualified to transfer to Baltimore had he not been discharged.)

George, by this time a candidate for office in Local 639, refused to accept the transfer, which would have placed him within the jurisdiction of another local union and would have made him ineligible to run for union office in Local 639. George rejected the Baltimore reinstatement offer, arguing that it was not in accord with the collective bargaining agreement between the Company and Local 639. He was then placed on layoff status at Ardmore, Maryland.

George then filed a formal grievance charging that the offer violated his seniority rights under the contract and maintaining that these seniority rights required that he be offered employment in one of Jacobs' other facilities in the Washington Metropolitan Area. The Joint Maryland-District of Columbia Area Committee voted to deadlock the grievance, requiring it to be heard by the Eastern Conference Joint Area Committee. Following a hearing on July 24, 1973, the Eastern Conference Joint Area Committee denied George's grievance (Case No. C–99–73).

On May 3, 1973 George had filed additional unfair labor practice charges with the Board alleging that Jacobs and Local 639 had conspired to deny him his seniority rights under the collective bargaining agreement. The complaint was dismissed on February 28, 1974 on the grounds that the allegations contained in George's charge were being considered in determining whether or not Jacobs' offer of reinstatement in Baltimore was in compliance with the Board's original backpay and reinstatement order. 201 N.L.R.B. 210.

On March 4, 1974 Board Regional Director William C. Humphrey advised the Company by letter that its offer to Daniel George of reinstatement in Baltimore did not "satisfy the requirements of the Board's order as the offer appears questionable under the applicable labor agreement." Subsequent to this March 4, 1974 letter, informal discussions took place between the Board's regional office and counsel for the Company, counsel for George and, following a May 15, 1974 telegram to Humphrey from counsel of Local 639, with counsel from the union. Unable to resolve the controversy over where to reinstate George, Regional Director Humphrey issued a Backpay Specification and Notice of Hearing for June 26, 1974 listing the union as party to the contract pursuant to its request of May 15, 1974.

Prior to the scheduled hearing, Jacobs and George entered into a written compliance agreement (negotiated under Humphrey's auspices) providing for George's reinstatement in the Washington Metropolitan Area. The agreement further provided that Jacobs would make contributions to the Pension and Health and Welfare Funds retroactively in such amounts as were necessary to make George whole. Jacobs also agreed to pay George full backpay with interest.

On June 25, 1974 Jacobs tendered to George backpay of $9,370.88, interest computed at 6% per annum in the amount of $1,123.88 and vacation pay amounting to $171.80. On June 27, 1974 Jacobs tendered $298.80 on behalf of George to Teamsters Local 639–Employers Health Trust and $2,111 on George's behalf to Teamsters Local 639–Employers Pension Trust. On July 15, 1974 Jacobs reinstated George to a position of regular freight driver at its Franconia, Virginia location, thereby displacing John Lester, the least senior employee at that location. Jacobs reassigned the bumped employee to other work at the Franconia site.

Despite Jacobs' reassignment of work to the bumped employee, Local 639 filed grievances on his behalf and on behalf of twelve other employees at defendant's Franconia operation, protesting the dove-tailing of George's seniority in violation of contract agreements, and on behalf of former employees at Jacobs' Ardmore terminal claiming that their seniority rights were violated in granting George preferential employment rights. The Joint Committee (the arbitration panel) upheld Local 639's claim and the decision that had been rendered a year before by the Eastern Conference [(No. C–99–73), rejecting George's grievance relating to Jacobs' first offer to reinstate him in Baltimore]. Thus, the arbitration findings that George's reinstatement should be in Baltimore were diametrically opposed to the terms of the compliance agreement.

Notwithstanding the compliance agreement, Local 639 attempted to persuade Jacobs to break the compliance agreement and abide by the arbitration decision denying Daniel George reinstatement rights in the Washington Metropolitan Area. Jacobs refused, asserting that the compliance agreement superseded the arbitration awards. Consequently, Local 639 brought this action on October 25, 1974 pursuant to Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) to enforce the arbitration awards of the Eastern Conference and the Joint Maryland-District of Columbia Conference and the Joint Maryland-District of Columbia Area Committee. Daniel George and the Board moved separately to intervene as defendants. Both motions were granted.

On October 25 and 29, 1974 respectively, the Health and Welfare Trust and the Pension Trust refused to accept the payments tendered by the Company pursuant to the compliance agreement. As a result George incurred out-of-pocket medical expenses amounting to $377 and suffered the loss of $2,111 from his pension account and 33 months of pension coverage. Thereafter, the Board issued an amended Backpay Specification in Case No. 5–CA–5308 alleging that George had not been made whole as required by the Board's Decision and Or-

der. On December 6, 1974, George filed an unfair labor practice charge against the union. On May 20, 1975, Board Regional Director Humphrey issued a complaint alleging that Local 639–Employers Health Trust and Employers Pension Trust had engaged in unfair labor practices in violation of § 8(b)(1)(A) and 8(b)(2) of the Labor Management Relations Act. The complaint was consolidated with the Backpay Specification, and a hearing was held at the end of July, 1975.

On November 14, 1975, Administrative Law Judge Bernard Seff found that Local 639's filing of the instant suit constituted an unfair labor practice within the meaning of the National Labor Relations Act, and that compliance had not been effected in Daniel George's unlawful discharge case because of the unlawful interference of the union and its agents. *Jacobs Transfer, Inc., et al.,* Board Case Nos. 5–CA–5309 and 5–CB–1639. In his decision, Administrative Law Judge Seff catalogued what he considered to be efforts by Local 639 to eliminate Daniel George from his employment with Jacobs and thereby disqualify him from active membership in the union. These included: (1) The Maryland-District of Columbia Joint Area Committee's upholding of George's discharge; (2) Unsuccessful attempts to make all "Committee for Reform" slate members ineligible to run for union office; (3) Election irregularities (resulting in George's filing of a charge with the Department of Labor on May 12, 1972, causing the Department of Labor to set the election aside and order a new election); (4) Attempts by Local 639 to accept a withdrawal card (resulting in a finding by United States District Court Judge George Hart that George had been required to take a withdrawal card in violation of the requirements of Local 639's own constitution and bylaws and in violation of the requirements of the Landrum-Griffin Act in reprisal for his activities opposing the incumbent officers of the union and in reprisal for George's complaints to the Secretary of Labor about election irregularities.

Judge Hart entered an order directing Local 639 to take no adverse action with respect to the membership rights of George based upon his nonemployment in the industry pending final disposition of the proceedings before the National Labor Relations Board and for three months thereafter).

Local 639 filed exceptions to the decision, which is now pending on appeal before the Board.

## OPINION

█ In essence, Local 639 seeks to enforce two arbitration awards providing that Daniel George should be reinstated at the Company's Baltimore rather than Franconia (i. e. Washington-area) facility. Ordinarily in such cases the standard of review is governed by the *Steelworker Trilogy. United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). These cases limit the Court to (1) "ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract" (*United Steelworkers v. American Mfg. Co., supra,* 363 U.S. at 568, 80 S.Ct. at 1346); (2) resolving doubts as to coverage of the arbitration clause in favor of arbitration (*United Steelworkers v. Warrior and Gulf Navigation Co.,* supra); and (3) enforcing an arbitrator's award, if based on the contract, even if his interpretation of the contract would differ from the court's (*United Steelworkers v. Enterprise Wheel and Car Corp., supra* ).

Since there is no dispute as to the authority of either the Eastern Conference Joint Area Committee and the Joint Maryland-District of Columbia Area Committee to render binding interpretations of the disputed provisions of the agreement between Local 639 and Jacobs Transfer, under normal circumstances this Court would be compelled by Section

301 of the Labor Management Relations Act to uphold those awards.

 As is apparent from the facts recited above, however, the matter is not so straightforward, and two primary problems are presented. First, the arbitration decisions which the union seeks to enforce directly conflict with the terms of the compliance agreement between George and the Company. That agreement purports to implement the Board's order that George be offered "immediate and full reinstatement to his former job, without prejudice to his former rights or privileges . . . ", as well as backpay. *Jacobs Transfer, Inc., supra.*[2]

Faced with a company offer of reinstatement which it believed to be insufficient, the Board could have issued a supplemental order directing that George be reinstated in Washington. This would presumably have constituted an exercise of its authority to interpret and give effect to the terms of a collective bargaining agreement, when such a determination is necessary to adjudicate an unfair labor practice. *N.L.R.B. v. Strong,* 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1968); *N.L.R.B. v. C. & C. Plywood,* 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967). The Board did not follow this course, however; instead, the Regional Director negotiated the compliance agreement.

If the compliance agreement is to be viewed as having the effect of a Board order, then the agreement would clearly prevail and the Court would have to deny enforcement of the conflicting arbitration decisions. *Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 49–50, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). However, no indication has been found in the statute, the case law, or Board regulations that this compliance agreement does have the status of a Board order, entitling it to supersede an arbitration decision. Consequently the Court does not view the compliance agreement as being a Board order in the sense necessary to automatically override the arbitration awards.

The Board also argues that the compliance agreement represents an exercise of its asserted power to determine the location of George's reinstatement as a "mere administrative determination" attendant on its original order of backpay and reinstatement, citing *Wallace Corp. v. N.L.R.B.,* 159 F.2d 952 (4th Cir., 1947) and *N.L.R.B. v. Bird Machine Co.,* 174 F.2d 404 (1st Cir., 1949). However neither of those cases, nor any others that the Court has found, contemplate that such a "mere administrative" detail should include a major interpretation of the collective bargaining agreement. Surely the Regional Director could not expect, for example, that a court would uphold an informal agreement (such as the one here in question) by which a low-seniority employee, unlawfully fired, was reinstated at the top of the seniority ladder. While the Board itself might be able to order such a result after formal proceedings, certainly the *Wallace* and *Bird Machine* cases did not intend to imply that such sweeping remedial power was as a "mere administrative determination" to be effected and enforced by way of a negotiated compliance agreement. Indeed, a careful reading of the cases shows that they were instead addressing the question of whether determination of the proper sort of reinstatement was an administrative function or a judicial function, i. e., whether under the Act such a determination should be made in the context of a contempt hearing in the Court of Appeals or whether it was of an administrative nature, committed by the Act to fact-finding by the Board. It was in this context that the

---

2. The Board's original order did not purport to conflict with or supersede the arbitration decision, since at the time the order was issued the Board did not contemplate that George's original job would be unavailable.

Court termed such a determination "administrative". *Wallace Corp. v. N.L. R.B., supra,* 159 F.2d at p. 955. The language of the *Bird Machine* decision, in fact, refutes the Board's contention here that it need not hold formal proceedings to achieve the result desired here; when the employee's former job no longer exists, it is

> proper for the Board to have a further *administrative hearing* on questions as to whether there were substantially equivalent positions in the Company's service, and as to what action should be taken, in view of changed conditions, to wipe out the effects of the unfair labor practices; such hearing having in contemplation supplemental findings by the Board, appropriate modification of the Board's previous order, . . . (emphasis added)

*N.L.R.B. v. Bird Machine Co., supra,* at p. 406. Moreover, the Board's own regulations also recognize that only details of compliance with an *explicit* order (e. g. the amount of backpay due) are to be effected by this sort of an agreement, rather than the substantive interpretation of a disputed collective bargaining provision. 29 C.F.R. §§ 101.13, 101.16. The net effect of these procedures, cases, and regulations, therefore, is to leave the Court with no basis on which to deny enforcement of the arbitration decisions.

 The second primary problem posed in this case is the pendency of the current unfair labor practice proceeding before the Board. In that pending action (*Jacobs Transfer, Inc. et al.,* Board Case Nos. 5–CA–5308 & 5–CB–1639), it has been charged and a trial examiner has found that Local 639 is engaging in an unfair labor practice by bringing this very suit. This finding is of course not binding until affirmed by the Board. However, if the Board affirms the trial examiner and finds that the maintenance of this suit constitutes an unfair labor practice, the Court would be most reluctant to permit itself to be used in such a manner, and would want to consider very carefully a possible dismissal of this action. To do otherwise might result in the facilitation of an unfair labor practice. Cf. *National Licorice Co. v. N.L.R.B.,* 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940). Since this issue remains unresolved, it seems prudent to stay the matter pending final decision by the Board.

An additional reason for staying this action pending the outcome of the Board proceeding is the possibility that the Board will choose at that time to amend its original reinstatement order to provide for reinstatement at Franconia, Virginia as called for in the compliance agreement. If this is done, the new order would supersede the arbitration awards, since " . . . the superior authority of the Board may be invoked at any time". *Carey v. Westinghouse Electric Corp., supra,* 375 U.S. at p. 272, 84 S.Ct. at p. 409, and the Court would be powerless to enforce the arbitration awards.

Accordingly, it is by the Court this 29th day of January 1976,

Ordered, that this action be, and hereby is, stayed pending final action by the National Labor Relations Board in Case Numbers 5–CA–5308 and 5–CB–1639, which shall be promptly reported to the Court by counsel for the Board.