**LOCAL 1837, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Plaintiff,**

v.

**MAINE PUBLIC SERVICE COMPANY, Defendant.**

**Civ. No. 82–0233–B.**

United States District Court, D. Maine.

Jan. 26, 1984.

Paul F. Zendzian, P.A., Augusta, Maine, Charles E. DeWitt, Jr., Flamm, Paven & Feinberg, Boston, Mass., Nathan S. Paven, Quincy, Mass., for plaintiff.

William Knowles and Robert A. Moore, Portland, Maine, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

CYR, Chief Judge.

This is an action brought under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, for judicial review of a labor arbitration award. Local 1837 of the International Brotherhood of Electrical Workers [Union] contends that the Arbitration Board [Board] exceeded its authority in fashioning the remedy for a breach by Maine Public Service Company [Company] of the collective bargaining agreement [Agreement] between the parties. The Union moves for summary judgment declaring that the award exceeded the Board's authority and ordering remand to the Board for the purpose of fashioning an appropriate remedy.[1] The Company contends that the award was authorized by the Agreement and, alternatively, that the Union is estopped from contesting the award.

### I. FACTS

Over the years it has been the practice of the Company's employees to take a fifteen minute coffee break on their way to their first work assignment of the day. Using company vehicles, employees would stop for coffee at a local restaurant of their choice. In the summer of 1981, the Company decided that this practice should be changed. Negotiations for a new collective

---

1. The complaint requests an order imposing the appropriate remedy, but at oral argument plaintiff's counsel recanted, stating that the appropriate judicial relief would be to remand the matter to the Board for the fashioning of appropriate relief.

bargaining agreement opened on September 1, 1981. On that day the Company orally announced its intention to change the coffee break practice. However, the coffee break practice was not discussed at any subsequent negotiating session and the Agreement executed on September 30, 1981, like all previous agreements, included no provision governing coffee breaks.[2]

■ In October 1981 the Company outlined a new coffee break practice providing for coffee breaks on Company property only. The Union considered the new coffee break practice implemented on December 1, 1981 to be a change of "past practices," and initiated grievance proceedings. The Union filed an unfair labor practice charge with the National Labor Relations Board [NLRB] on December 7, 1981. On January 14, 1982, the NLRB deferred to arbitration.[3]

Having completed the grievance procedure without resolving the dispute, the parties submitted the matter to the Board "pursuant to Article 32 of the Agreement." [Complaint, at ¶ 14; Answer, at ¶ 14.] The submission was phrased as follows:

> Did the Company violate the Collective Bargaining Agreement by implementing a change in the coffee break policy/procedure on or about December 1, 1981?
>
> If so, what shall be the remedy?

On July 14, 1982 the Chairman of the Board [Chairman] issued his decision [Award]. Finding that the parties' course of dealing rendered the coffee break practice "contractually binding," the Chairman concluded that the Company had "violate[d] the Collective Bargaining Agreement by implementing a change in the coffee break policy/procedure on or about December 1, 1981." [Award, at 10.]

> Turning to the remedy, the Chairman [found] particularly compelling the Company's assertions [regarding] 'Public relations or public awareness.' In a society where, and at a time when, energy conservation has become national policy (55 mile per hour speed limit) and the costs and price of electricity have skyrocketed, it is understandable why [the Company's] customers could be upset by what they perceived to be energy waste and operating inefficiency even if what they observed was appropriate and justifiable.

The Chairman therefore directed the parties to bargain collectively and to submit their last best offers to the Board by Sep-

---

2. The Agreement did include a management rights provision, Article 3, section 1, which provided as follows:

> ARTICLE 3—MANAGEMENT RIGHTS (J–1 & J–2)
>
> Section 1. It is agreed that subject to the terms of this Agreement, the Management of the business and the direction of the working force of the Company shall be within the sole control of the Company, including, but not limited to, the right to hire, promote, transfer, and to discipline, suspend or discharge for cause, and to lay off employees because of lack of work. The Company shall also determine the numbers and kinds of employees required at any particular time or place, the methods and equipment to be used, and the work assignments and tours of duty. Nothing in this Article is intended nor shall be construed as authorizing violation of this Agreement or of (sic) depriving the Union or any employee of any rights granted hereunder or determined by law.

3. The memoranda of the parties and the Award of Arbitration indicate that prior to the arbitration proceedings the Union submitted this dispute (as a grievance) to the NLRB. Apparently the NLRB "deferred resolution to the Parties' contractual grievance-arbitration procedure," presumably concluding that the dispute gave rise to a question of contract interpretation. The resolution of such questions is a function reserved primarily to the courts under 29 U.S.C. § 185. *National Labor Relations Board v. C & C Plywood Corp.*, 385 U.S. 421, 427–28, 87 S.Ct. 559, 563–64, 17 L.Ed.2d 486 (1967). *See William E. Arnold Co. v. Carpenters District Council*, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974) [acknowledging NLRB policy of refraining from reviewing alleged unfair labor practice where conduct arguably also gives rise to contract violation]. Thus, the fact that the Company may have engaged in an unfair labor practice does not preempt this Court's jurisdiction under section 185. *E.g., id.; Peltzman v. Central Gulf Lines, Inc.,* 497 F.2d 332, 334 (2d Cir.1974), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976). It does not appear (and neither party contends) that this matter is currently before the NLRB.

tember 20, 1982, if their efforts at collective bargaining were unsuccessful. The Board would then select one of the offers as its remedy.

In its letter of September 20 to the Chairman, the Union maintained that, in view of the Board's finding as to the binding nature of the coffee break practice, "the only proper award is one which returns the coffee break procedure to that practiced by the parties before December 1, 1981." The Board adopted the Company's offer to conduct future coffee breaks on Company property.

## II. MERITS

■ An arbitrator's powers to fashion remedies are broad, see *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 281 (1st Cir.1983), but not boundless.

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361. *Enterprise Wheel* made clear that courts are not to review "the merits of an arbitration award ... under [a] collective bargaining agreement[ ]." *Id.* at 596, 80 S.Ct. at 1360. Courts ever since have struggled to find the line of demarcation between reviewing the merits and deciding whether an award draws its essence from the collective bargaining agreement. It is generally agreed that awards do not draw their essence from a collective bargaining agreement which they directly contravene. *International Brotherhood of Firemen & Oilers v. Nestle Co., Inc.*, 630 F.2d 474, 477 (6th Cir.1980); *Detroit Coil Company v. International Association of Machinists & Aerospace Workers, Lodge #82*, 594 F.2d 575, 579–80 (6th Cir.1979) *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *NF & M Corp. v. United Steelworkers of America*, 524 F.2d 756 (3d Cir.1975). *See International Union of Electrical, Radio & Machine Workers v. Peerless Pressed Metal Corp.*, 489 F.2d 768, 769 (1st Cir.1973); *Truck Drivers & Helpers Union, Local 784 v. Ulry-Talbert Co.*, 330 F.2d 562, 564–66 (8th Cir.1964). But awards which do not directly contravene the collective bargaining agreement are generally enforced if they are rationally connected to it. *Detroit Coil Company v. International Association of Machinists & Aerospace Workers, Lodge #82*, 594 F.2d at 579. Thus, "if the reasoning is so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling, then the Court can strike down [an] award," even though it does not contravene the collective bargaining agreement. *International Union of Electrical, Radio & Machine Workers v. Peerless Pressed Metal Corp.*, 489 F.2d at 769, *quoting Safeway Stores v. Bakery Workers Local 111*, 390 F.2d 79, 82 (5th Cir.1968). *See also Bettencourt v. Boston Edison Co.*, 560 F.2d 1045, 1049–50 (1st Cir.1977) [party challenging award must show that it is "unfounded in reason and fact"].

■ The Union contends that the award directly contravenes the Agreement by ordering a change in the coffee break practice which the Board had already found to

be a binding "past practice"[4] governed by the Agreement. Specifically, the Union points to Article 32, section 4.

> Section 4. No Board of Arbitration shall have the power to add to, or subtract from, or modify any of the terms of this Agreement, or pass upon or decide any question except the grievance submitted to the Board in accordance with the foregoing provision. No award or decision of a Board of Arbitration shall be retroactive for more than sixty (60) days before the grievance was reduced to writing as provided in the grievance procedure.

Such provisions effectively limit the arbitral power to fashion remedies. *Amanda Bent Bolt Company v. International Union, United Automobile, Aerospace, Agricultural Implement Workers of America*, 451 F.2d 1277, 1280 (6th Cir.1971). *See International Association of Machinists v. Howmet Corp.*, 466 F.2d 1249, 1252–53 (9th Cir.1972); *Tobacco Workers International Union, Local 317 v. Lorillard Corp.*, 448 F.2d 949, 955 (4th Cir.1971).

Since the second issue submitted to arbitration was "What shall be the remedy?", the Company contends that the remedy prescribed by the Board was permissible in light of the proviso in section 4, "except the grievance submitted." But section 4 is disjunctive and the quoted proviso modifies only the word "question," not the prohibition against adding to, subtracting from or modifying the Agreement.[5] Indeed, but for the proviso modifying the word "question," it would appear that nothing could be submitted to arbitration. Therefore and since there is no challenge to the correctness of the Board's determination that the Company violated the Agreement,[6] the Court agrees that the remedy directly contravenes Article 32, section 4 and section 6, and Article 40 [*see* nn. 7 & 17 *infra*]. Furthermore, although the remedy fashioned by the Board may be said to have drawn its essence from Article 40,[7] *insofar as it directed the parties to negotiate, see* Article 40, § 2, ¶ 3, the ultimate remedy selected by the Board (i.e., its adoption of the Company's new unilaterally-imposed coffee break practice) flies in the face of the Agreement,[8] both as construed by the

---

**4.** *See* Exhibit "F", attached to Complaint, at p. 2. The Board indeed did find that "... the coffee break policy/procedure prior to December 1, 1981, was a binding past practice requiring collective bargaining by the Parties before implementing changes." Award of Arbitration, at 10.

**5.** The Company would read section 4 as withholding "the power to add to, subtract from, or modify any of the terms of this Agreement ... except the grievance submitted to the Board."

**6.** The Company does not deny that the Board so held, *see* n. 8, *infra*, nor does it contend that the holding was unwarranted. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–82, 80 S.Ct. 1347, 1350–53, 4 L.Ed.2d 1409 (1960) [arbitrator commissioned to fill gaps in express language may draw on parties' practices, which are "equally a part of the collective bargaining agreement although not expressed in it"]; *Yellow Cab Co. v. Democratic Union Organizing Committee, Local 777*, 398 F.2d 735, 737 (7th Cir.1968), *cert. denied*, 393 U.S. 1015, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969).

**7.** Article 40 provides as follows:
TERM OF AGREEMENT
Section 1. This Agreement shall become effective 12:01 a.m., October 1, 1981 and shall

remain in effect until Midnight, September 30, 1983. It shall continue in effect from year to year thereafter, from October 1st of each year, unless changed or terminated in the manner provided herein.

Section 2. Either party desiring to (a) change or (b) terminate this Agreement must notify the other of its desire in writing at least sixty (60) days prior to October 1, 1983, or October 1st of any year thereafter. Unless either a notice of change or notice of termination is given, this Agreement shall automatically continue for another year.

If notice of termination is given, this Agreement will terminate at Midnight, September 30, of that year (unless another date is mutually agreed upon) and thereafter be of no force or effect.

If a notice of desire to amend or change the Agreement is given as above provided, it shall specify the changes or amendments desired. As soon as practicable, the parties shall commence negotiations for a new agreement.

**8.** In its memorandum, the Company states:

[T]he Board's remedy is consistent with the Board's finding that 'the coffee break policy/procedure prior to Deceember (sic) 1, 1981, was a binding past practice requiring collective bargaining by the Parties before im-

Board and as expressly stated in Article 32 and Article 40. Therefore, it cannot be said that the remedy draws its essence from the Agreement.

But were the restrictions of the Agreement cast aside because the parties submitted the question "What shall be the remedy?" without making reference to the collective bargaining agreement? Citing *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse* *Ind. Truck Drivers Union, Local No. 1,* 611 F.2d 580 (5th Cir.1980), the Company contends that this is precisely what happened.[9] In *Piggly Wiggly* an employee was discharged pursuant to a provision in the collective bargaining agreement (section z) which the union contended had not been properly ratified. The union filed a grievance, contending that section z was invalid. Unable to resolve the dispute, the parties submitted the grievance to arbitration.[10] Agreeing that section z was invalid,

plementing changes.' The fact that the Company changed the prior practice was not improper; rather, to do so prior to negotiation was where the Company failed. The Board's remedy simply *required the parties to negotiate* as required by their contract, which they did. The fact that the Board chose the Company's proposal simply reflects the result which would have existed had the parties negotiated to a dead-end prior to reaching agreement on September 25, 1981. Company's Memorandum at 9. Although this contention was not pressed by the Company at oral argument, it is deserving of consideration by the Court.

The quoted contention assumes that the unsuccessful post-award negotiation between the parties was in all respects an adequate substitute for the collective bargaining required, but never had, *before* the binding coffee break practice was unilaterally changed by the Company. However, by virtue of the Board's determination that the coffee break practice was a "contractually" binding part of the Agreement, the Board precluded itself from determining that an *attempt* at post-award negotiations was all that was required and that the Board could then select between the last best offers submitted by the parties. *See International Brotherhood of Firemen & Oilers v. Nestle Co., Inc.,* 630 F.2d 474, 476 (6th Cir.1980) [arbitrator impermissibly ignored his finding of insubordination in failing to approve company's imposition of sanction prescribed by collective bargaining agreement].

The Agreement requires that before a change in the Agreement can be effected the party desiring the change "... must notify the other [party] of its desire [to effect the change] in writing at least sixty (60) days prior to October 1, 1983, or October 1st of any year thereafter. Unless ... a notice of change ... is given, ·this Agreement (which § 1 of Article 40 expressly states 'shall remain in effect until Midnight, September 30, 1983') shall automatically continue for another year" (i.e., for a year beyond September 30, 1983). (*Emphasis added.*) The final paragraph of Article 40, section 2, states that "[a]s soon as practicable [after giving written notice of desire to change, as required by section 2], the parties shall commence negotia-

tions for a new agreement." Assuming [the Board did not address the question] that a proper written notice of intent to change the coffee break practice was given by the Company, the parties became obligated, under Article 40, § 2, ¶ 3 of the Agreement, to commence negotiations "for a new *agreement"* (*emphasis added*), failing which the existing Agreement was *to remain in effect, without change, pending its termination,* not earlier than September 30, 1983, as provided by Article 40, section 1.

The Board's remedy rendering the unilateral *change effective on October 1, 1982,* a full year in advance of the earliest possible termination date of the Agreement, cannot be said to derive its essence from the Agreement.

**9.** As noted above, the Company actually couched its argument in terms of estoppel. *Piggly Wiggly,* the only authority cited by the Company, stated that whether the rule is couched as "waiver, estoppel or new contract" is unimportant, 611 F.2d at 584, but made clear that a "modification" of the collective bargaining agreement was assumed to have taken place, *id.* Regardless of how the Company's contention be couched, it must be rejected for essentially the reasons discussed in the text. Neither waiver nor estoppel can be shown since the Union has never adopted any position or taken any action inconsistent with its current position. Indeed, the first time that the Union had any substantial reason to suspect that the Board might disregard the Agreement it promptly and unambiguously informed the Chairman of its objection.

**10.** The grievance provided,

Purported Section (z) of Article 21 of the contract is not a valid term of the contract. Second, my driving record is a direct and inevitable consequence of company policies and cannot be used to penalize me. Third, any violations prior to the effective date of this contract cannot be used to my disadvantage pursuant to an understanding and agreement between the parties to the contract. Further, I deny that I am uninsurable as alleged in the company's letter.

*Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Ind. Truck*

the arbitrator ordered the employee reinstated. Instead, the employer went to court, seeking to vacate the award on the ground that, in determining the invalidity of section z, the arbitrator impermissibly "subtracted from" the agreement.[11] The Fifth Circuit refused to reach this question, holding instead that since the employer had agreed to arbitrate the validity of section z it was foreclosed from contesting the arbitrator's authority to decide the question.

If the parties enter into a submission agreement, ...

> [t]he arbiter's jurisdiction is then not limited to the issues that the parties could have been compelled to submit; the parties may agree on this method of resolving disputes that they were not compelled to submit to arbitration. The parties may act formally and enter into a written submission agreement or they may merely ask the arbiter to decide the written grievance as it has been posed in their conciliation efforts. When they do so, they have in effect empowered him to decide the issues stated in the grievance. The grievance itself becomes the submission agreement and defines the limits of the arbitrator's authority. Arbitration is a matter of contract, *International Ladies' Garment Workers' Union v. Ashland Industries, Inc.*, 5 Cir.1974, 488 F.2d 641, 644, *cert. denied sub*

*nom. Alfin v. International Ladies Garment Workers' Union*, 419 U.S. 840, 95 S.Ct. 71, 42 L.Ed.2d 68, but the initial contract to arbitrate may be modified by the submission agreement or grievance.[12]

*Id.* at 584 [citations and footnote omitted]. Since the Fifth Circuit viewed the employer's objection as going to "arbitrability," *id.*, its holding is merely that a party voluntarily submitting a question to arbitration cannot later contest the award on the ground that it could not have been compelled to arbitrate. This proposition finds ample support in decisional law, *e.g., Syufy Enterprises v. Northern California State Association of Iatse Locals*, 631 F.2d 124, 125 (9th Cir.1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981); *International Brotherhood of Teamsters v. Washington Employers, Inc.*, 557 F.2d 1345, 1350 (9th Cir.1977); *Metal Products Workers Union v. Torrington Co.*, 358 F.2d 103, 106 (2d Cir. 1966); *Jarrell v. Wilson Warehouse Co., Inc.*, 490 F.Supp. 412, 416–17 (M.D.La. 1980), and in common sense. It would be detrimental to the expeditious resolution of industrial disputes, and it would be inequitable as well, to allow a party which has agreed to proceed to "binding" arbitration to reserve, *sub silentio*, the contention that only the remedy *it* seeks can be binding.[13]

Drivers Union, Local No. 1, 611 F.2d 580, 582 (5th Cir.1980). The relevant facts are set out by the district court at 438 F.Supp. 164, 166 (W.D. La.1977).

**11.** The collective bargaining agreement before the *Piggly Wiggly* court provided in part as follows: "The Arbitrator shall have no authority to change, amend, add to, subtract from, modify or amend any of the terms or provisions of the agreement." *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Ind. Truck Drivers Union, Local No. 1*, 611 F.2d at 582.

**12.** The grievance submitted by the Union here reads:

> The bargaining unit employees of Maine Public Service Co. Submittes (sic) this grievance against the new coffee break policy put into effect 12/1/81 by the Company (MPS Co) persented (sic) on letter of past practice dated Oct, 1, 1979 to be updated to read Oct, 1, 1981.

**13.** Waiver has been applied in a number of situations in which arbitrability as such was not the issue. But these cases invariably involve some procedural or other defect in the arbitration procedure which should have been but was not raised during arbitration, *see United Steelworkers of America v. Smoke-Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir.1981) [company failure to raise propriety of individual representation of various members and whether settlement had mooted matter, thereby waived issues], *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1718, 72 L.Ed.2d 139 (1982); *Kodiak Oil Field Haulers, Inc. v. Teamsters Union, Local No. 959*, 611 F.2d 1286, 1290 (9th Cir.1980) [failure to object to arbitrator's bias waived issue].

Similarly, parties have been foreclosed from supplementing the record on appeal with information which could and should have been supplied to the arbitrator. *Mogge v. District 8, International Association of Machinists*, 454 F.2d 510, 513 (7th Cir.1971).

Moreover, to the extent that *Piggly Wiggly* can be read as recognizing that a submission agreement may permit an arbitrator to disregard or modify provisions of the collective bargaining agreement, the only authority supporting such a view relates to the modification of those provisions of a collective bargaining agreement which relate to arbitrability or matters of arbitral procedure.

■ The Court has found and *Piggly Wiggly* cites no other federal case holding that a submission may "modify" the provisions of a collective bargaining agreement.[14] *Piggly Wiggly* correctly cites four labor cases, *i.e.*, *Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 143 U.S.App.D.C. 210, 212, 442 F.2d 1234, 1236 (D.C.Cir.1971); *Truck Drivers & Helpers Union, Local 784 v. Ulry-Talbert*

*Co., supra; Textile Workers Union of America, AFL–CIO, Local Union No. 1386 v. American Thread Co.*, 291 F.2d 894 (4th Cir.1961); *Lee v. Olin Mathieson Chemical Corp.*, 271 F.Supp. 635, 639 (W.D.Va.1967), for the proposition that courts look both to the collective bargaining agreement and to the submission in defining the authority of a labor arbitrator. But none of the four cited cases holds that the submission may permit the arbitrator to disregard the collective bargaining agreement. Rather, the cases follow the general rule, *see United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. at 597–98, 80 S.Ct. at 1361; *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d at 281; *International Union of Electrical, Radio & Machine Workers v. Peerless Pressed Metal Corp.*, 489 F.2d at 769, that a labor

**14.** The Court has found a decision by a California Court of Appeals which does adopt essentially the position of the Company. *Brotherhood of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees v. Universal Carloading & Distributing Co.*, 1 Cal.App.3d 145, 149, 81 Cal.Rptr. 516, 519 (1969). The union contended that one of its members had been improperly discharged by Universal Carloading. Pursuant to their collective bargaining agreement the parties filed the following submission: "Under the terms of the Labor Agreement dated October 31, 1966, did the Company act properly when it terminated Demosthenes Shaw in January 1967? If not, what remedy is ordered? *Id.*, 1 Cal. App.3d at 147, 81 Cal.Rptr. at 517. The arbitrator found the termination improper and ordered the employee reinstated, but without back pay. The Union contested the award, contending that the refusal to award back pay contravened certain collective bargaining agreement provisions limiting arbitral authority and requiring back pay for wrongfully discharged employees. In upholding the award, the Court stated:

> The parties here could, of course, have submitted to the arbitrator only the issue of unlawful termination, reserving for the future any questions of remedy; they could have submitted the issue of unlawful termination and the issue of what remedy the contract afforded. But they did neither. They submitted to the arbitrator the broad and general issue: '... what remedy is ordered?' Having thus mutually invited him to frame his own remedy according to his own conscience, neither can now object that he framed a remedy not to its liking.

*Id.* 1 Cal.App.3d at 149, 81 Cal.Rptr. at 519. The only case cited in *Universal Carloading, i.e., Fidelity & Cas. Co. of New York v. Dennis*, 229 Cal.App.2d 541, 40 Cal.Rptr. 418 (1964), involved a dispute as to the *arbitrability* (as defined in the underlying contract) of a question voluntarily submitted to arbitration. Moreover, the precedential value of *Universal Carloading* is weakened by the only reported decision in which it is cited, *i.e., National Indemnity Co. v. Superior Court*, 27 Cal.App.3d 345, 103 Cal.Rptr. 606 (1972), which, like *Dennis*, involved a dispute as to arbitrability under the underlying insurance contract. After citing *Universal Carloading* and *Dennis* for the proposition that a submission agreement may broaden the arbitrable issues, the *National Indemnity* court stated that "still, normally, an arbitration under an uninsured motorist provision of an insurance contract is limited to the issues contemplated by that agreement unless a clearly expressed agreement to broaden the scope of such an arbitration is established." *Id.*, 27 Cal. App.3d at 349, 103 Cal.Rptr. at 608.

This Court need not and does not go so far as to say that a submission agreement must be "clear" to the extent that it seeks to submit to voluntary arbitration matters as to which compulsory arbitration was not authorized. *Cf. United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. at 583 n. 7, 80 S.Ct. at 1353 n. 7 [issue as to arbitrability may be subject of compulsory arbitration if collective bargaining agreement makes "clear demonstration of that purpose"]. But, for the reasons set forth below, the Court is satisfied that the submission did not authorize the arbitrator to amend the Agreement by fashioning a remedy "according to his own conscience."

arbitration award will be enforced only to the extent that it draws its essence from the collective bargaining agreement and only as to issues actually submitted. *Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 442 F.2d at 1236–38; *Truck Drivers & Helpers Union, Local 784 v. Ulry-Talbert Co.*, 330 F.2d at 565–66; *Textile Workers Union of America v. American Thread Co.*, 291 F.2d at 896–97 [submission expressly incorporated limitations of agreement]; *Lee v. Olin Mathieson Chemical Corp.*, 271 F.Supp. at 639.

■ Irrespective of the potential breadth of *Piggly Wiggly*'s application, however, the Court is satisfied that this submission did not "modify" the Agreement as the Company contends. The essence of the Company's argument is that the Board was commissioned to interpret and apply the Agreement in deciding whether a breach had occurred, but that the Board was authorized to disregard the Agreement and apply its own brand of industrial justice in deciding "what shall be the remedy?"

The Court must interpret the meaning and define the scope of the submission, *see Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d at 281–82, in order to determine whether the Board restricted itself to the issues submitted, *see id.* at 281; *International Association of Machinists v. Texas Steel Co.*, 639 F.2d 279, 283 (5th Cir.1981). Again, however, the judicial role is narrow. *Id. See Kroger Co. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 661*, 380 F.2d 728, 731 (6th Cir.1967) [award upheld where submission was "reasonably susceptible" to interpretation authorizing arbitrator to address issues decided]. *But cf. Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d at 282 [remedy which parties do not "normally suppose that an arbitrator will fashion," held to be beyond scope of submission].

The history and the role of labor arbitration, the language of the Agreement, the context and manner in which the issues were submitted to arbitration, and the language of the Award itself, satisfy the Court that the Company's interpretation is incorrect.

The *Steelworkers* trilogy prescribed several important principles which have governed the nature of labor arbitration and guided judicial review in arbitration cases for nearly a quarter of a century, including the fundamental principle that labor arbitrators are creatures of the collective bargaining agreement, which "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... [It] is an effort to erect a system of industrial self-government." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–80, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). The vastness of the undertaking usually requires that "[g]aps may be left to be filled...." *Id.* at 580, 80 S.Ct. at 1352. "Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems that may arise...." *Id.* at 581, 80 S.Ct. at 1352. Thus, the arbitration provisions and the procedures themselves are part and parcél of the "collective bargaining process." *Id.* It is in large part because of the special nature and role of labor arbitration that courts rarely excuse a party from labor arbitration, *id.* at 585, 80 S.Ct. at 1354, or interfere with an arbitrator's award, *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. at 597–99, 80 S.Ct. at 1361–62.

In view of these general principles, which are no doubt familiar to the drafters of arbitration submissions and collective bargaining agreements alike, it seems highly unlikely that the parties will often intend to sever the arbitration process from the collective bargaining agreement. Yet another factor counsels against leaping to the conclusion that the parties intended a severance. In most collective bargaining agreements, including this Agreement, the employees surrender their only weapon of economic self-help. In return for foregoing

their right to strike, workers receive the assurance that the contract, including its grievance procedures, will remain in force. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. at 583, 80 S.Ct. at 1353. Moreover, since the collective bargaining agreement binds not merely two institutions but also the individual employees in the bargaining unit, frequently the collective bargaining agreement is subject to approval by the union membership. For these and other reasons, most collective bargaining agreements, including this Agreement, *see* nn. 7 & 11 *supra*, prescribe the permissible method or methods for their amendment.

Except in extraordinary circumstances nowhere in evidence in this case, it must be presumed that the parties (especially a union arbitrating the rights of a substantial portion of the bargaining unit) would not intend to empower an arbitrator to disregard their collective bargaining agreement in fashioning a remedy for its breach. The presumption cannot be overcome merely on the basis of the failure of the remedy submission to incorporate an express reference to the collective bargaining agreement.

The incongruity inherent in the Company's position results from the fact that it reads the remedy submission as if it stood alone. Although the second sentence of the submission (remedy) does not mention the Agreement, the first sentence does. Indeed, the first sentence of the submission virtually incorporates the entire Agreement. When the entire submission agreement, consisting of these two interdependent sentences, is read together, as it must be, it becomes clear, even without considering the context (collective bargaining) in which the dispute arose, that the more

faithful reading is that the arbitrator is to determine what is the appropriate remedy under the Agreement which was violated.[15]

The plain language of the collective bargaining agreement governing the role and authority of the arbitrator must control the less clear language of the ancillary (submission) agreement. Article 32, section 6, of the Agreement provides in most pertinent part: "The *sole* function of the Board of Arbitration shall be to decide the specific issues submitted to them *on the basis of* facts and *proper application and interpretation of this Agreement.*" (*Emphasis added.*) The mere absence of an express reference to the Agreement in the *remedy* submission cannot be considered an agreement to cast aside these clearly contrary provisions of the *basic* labor-management relations agreement between the parties, without doing violence to the ancillary submission agreement and abrogating the collective bargaining agreement in relevant part.

The manner in which the remedy submission is phrased is consistent with the Agreement and with the Union's position before the Court. In these respects the present case differs from every federal labor arbitration case which has found waiver, estoppel or "modification."

Finally, although the basis for the Chairman's award is not entirely clear, he did *not* conclude that he was authorized to disregard the contract in fashioning a remedy. The Chairman explained that the remedy was fashioned "in view of" Article 32, section 6, of the Agreement, which, "in part pertinent," prohibits the Arbitrator from making suggestions or recommendations and from giving advice.[16]

**15.** The Company erroneously contends that the Court's interpretation renders surplusage the question, "What shall be the remedy?" Even if the only appropriate remedy were to reinstate the prior coffee break practice (and the Court makes no such determination), such was not the case at the time of the submission. When the parties drafted the submission many interpretations of the Agreement (and a correspondingly greater number of remedies) were arguably appropriate.

**16.** The Chairman obviously need not have concerned himself with whether he was giving advice, recommendations or suggestions to the parties had he believed that the remedy submission left him unfettered by the provisions of the Agreement circumscribing his arbitral powers. It is true, of course, that had the Chairman dealt with the remaining language of section 6, *see* p. 753 *supra*, and had he focused on Article 40, *see* nn. 7 & 8 *supra*, he almost certainly would not have prescribed the ultimate remedy he did.

The Board was commissioned to interpret and apply the Agreement, yet its remedy award contravenes unambiguous provisions of the Agreement, which were neither waived nor modified.[17] Without regard to whether the energy policy and customer dissatisfaction rationales expressed by the Chairman were well-founded, under the terms of the Agreement circumscribing his arbitral powers the Chairman was not permitted "to dispense his own brand of industrial justice," *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361, however reasonable and just.

Accordingly, plaintiff's Motion for Summary Judgment is *GRANTED*; and summary judgment shall enter (1) declaring that in fashioning its remedy the Board exceeded its authority; (2) vacating the award of the Board of Arbitration; and (3) remanding this matter to the Board of Arbitration for a determination of the appropriate remedy.

SO ORDERED.

---

But the Chairman *first* prescribed collective bargaining, which was plainly consistent with the Agreement. It seems entirely possible that the provisional remedy of selecting between the parties' last best offers was viewed by the Chairman as a means of inducing the parties to bargain in good faith to resolve a dispute which it was reasonable to suppose would not become a "federal case."

**17.** The remedy ultimately imposed by the Board is not only inconsistent with the Agreement, but would appear to contravene the spirit of the Labor-Management Relations Act as well.

§ 158.  *Unfair labor practices*
(a) It shall be an unfair labor practice for an employer
. . . .
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
. . . .
(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification [Supp.1983]
. . . .
(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later. . . .
The duty to bargain collectively here included the obligation on the part of the Company to refrain from imposing any change "until the expiration date of [the Agreement]," which could not have been earlier than October 1, 1983, *see* Article 40, § 2; n. 8 *supra*. Although the provisions of section 158(d) of the Labor-Management Relations Act relate to mediation and conciliation in labor disputes and were never invoked by the parties, those provisions conform so closely with the provisions of the Agreement, *see* Article 32, § 7, that it cannot be supposed that the Board derived any appropriate insight into the proper interpretation of the Agreement from the Labor-Management Relations Act. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597–98, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) [explaining that although the arbitrator may not exceed bounds of submission to apply "the requirements of enacted legislation," he may "look[ ] to 'the law' for help in determining the sense of the agreement."]