884 F.2d 578
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CARPENTERS DISTRICT COUNCIL OF DETROIT, WAYNE, OAKLAND,
MACOMB, ST. CLAIR, SANILAC, AND MONROE COUNTIES
AND VICINITIES, UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Thermo Electron Corporation, Holcroft/Loftus, Inc. Intervenor.
 No. 88-6247.
 United States Court of Appeals, Sixth Circuit.
 Aug. 31, 1989.
 
 Before BOYCE F. MARTIN, Jr., WELLFORD and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Carpenters District Council of Detroit ("Union") petitions this court to set aside an order of the National Labor Relations Board dismissing its unfair labor practice complaint against Thermo Electron Corporation, Holcroft/Loftus, Inc. ("the Company"). The Company has intervened in this proceeding on the Board's behalf.
 
 
 2
 The Union's allegation of an unfair labor practice arises from the Company's distribution of benefits to certain employees upon the termination of its pension plan. The Board held the controversy involved only "a contractual dispute," not an unfair labor practice, and dismissed the complaint.
 
 I.
 
 3
 On March 1, 1985, the Union filed an unfair labor practice charge against the Company, alleging it had refused to bargain with the Union in violation of the National Labor Relations Act,[1] by unilaterally reducing existing pension benefits of bargaining unit employees without Union approval. On April 4, 1985, the General Counsel issued a complaint and notice of hearing based upon this charge.
 
 
 4
 On February 14, 1986, the Union filed another unfair labor practice charge against the Company, which incorporated the allegations made in the preceding charge and further alleged that the Company had refused to furnish the Union with certain information concerning the Company's new retirement plan. On March 20, 1986, the General Counsel ordered the cases consolidated and issued an amended complaint and notice of hearing.
 
 
 5
 Hearings were held before an Administrative Law Judge on April 21, June 30, and July 1, 1986. On October 28, 1986, the ALJ issued his decision finding the Company's failure to provide the Union with prior notice regarding its intention to reduce employees' accrued pension benefits violated sections 8(a)(1) and (5) of the Act. The ALJ further found that the Company's failure to provide prior notice, engage in bargaining, or secure the Union's approval before unilaterally reducing certain employees' pension benefits during the term of the collective bargaining agreement violated sections 8(a)(1) and (5) and section 8(d) of the Act.
 
 
 6
 On December 10, 1986, the Company filed exceptions to the ALJ's decision with the Board. On December 16, 1987, the Board issued a Decision and Order reversing the ALJ's decision and dismissing the complaint on the ground that the dispute was one of contractual interpretation.[2]
 
 
 7
 On January 26, 1988, the Union filed a motion for reconsideration, which the Board denied on September 7, 1988. The Union petitioned for review by this court on November 7, 1988. As the conduct alleged as an unfair labor practice occurred in Livonia, Michigan, where the Company manufactures, sells, and distributes its products, this court has jurisdiction over the Union's petition pursuant to section 10(f) of the Act (codified at 29 U.S.C. Sec. 160(f)).
 
 
 8
 At all times relevant to this dispute, the Company's production and maintenance employees were represented by the Union, pursuant to a collective bargaining agreement effective October 1, 1983, through September 30, 1986. In the Company's collective bargaining agreement was a reference to the Company's then-existing employee pension plan, known as the Holcroft Retirement Trust Plan. The Wyatt Company, a benefits and compensation actuary, prepared and administered the plan.
 
 
 9
 The reference to the pension plan in the collective bargaining agreement is stated in Article X:
 
 
 10
 The Holcroft Retirement Trust Plan covers all shop Employees with one year of service as of June 30.
 
 
 11
 Should changes be desired, it is the privilege of the Management to make new plans or to revise existing plans without consulting the Union. However, existing Pension Benefits cannot be reduced or terminated without prior approval of the Union.
 
 
 12
 Section 11.3 of the plan, entitled "Procedure Upon Termination," provided that "Accrued Benefits determined as of the date of [the plan's] termination of all affected Participants shall be fully vested." Section 5.5 of the plan, entitled "Deferred Vested Benefit," limited the benefits of employees who had five or more years of continuous service but who, "for reasons other than retirement or death," were separated from the Company. The benefits due vested employees were a fractional percentage of their accrued benefits, based upon their years of service with the Company.[3]
 
 
 13
 In 1983, the Company decided to terminate its retirement plan and replace it with another pension plan, as permitted under Article X of the collective bargaining agreement.[4] On November 21, 1983, the Company sent letters to all its current employees, terminated but "vested" employees, and retirees, informing them of the planned termination. In the letter, the Company informed the pension plan participants that "whatever benefit each of you is entitled to as per the terms of the current plan will be given to you upon formal termination of the plan."
 
 
 14
 On February 6, 1984, the Internal Revenue Service approved the termination. Following the termination, the plan actuary calculated the benefits the participants were entitled to receive. The Company followed Wyatt's recommended distribution of benefits, and advised each employee of the benefits he would receive.
 
 
 15
 In late October or early November 1984, Union representative Merle Scriver learned from his steward that certain employees felt they were to receive less than their share of benefits in the payout. In a letter dated November 8, 1984, Scriver requested information from the Company concerning the details of the intended payout, the manner in which it was calculated, and related matters.
 
 
 16
 On November 20, 1984, Scriver and Union Attorney Ann Naydon discussed the proposed payout with his union steward, the Company's vice-president, Joseph Mirisola, and the manager of manufacturing, William Smith. At that meeting, the Company's representatives explained that those employees who had been on the active payroll on February 6, 1984--the termination date--would receive their full accrued pension benefits. Employees who were vested in the plan, but who had been terminated from Company employment on February 6, 1984, would receive only their deferred vested benefits.
 
 
 17
 This appeal concerns approximately fourteen employees who had been laid off from the Company for over three months as of February 6, 1984. These employees had been automatically terminated under section 3.1(b)(3) of the plan, which provides, "an employee who is on layoff shall be discharged at the end of three months of layoff if he has not been recalled to work for the Company." However, these employees were recalled to work after February 6 and remained active employees at the time of the November 1984 payout. Because these fourteen were not employees on February 6, the Company paid them only their vested benefits, as calculated for terminated employees under section 5.5 of the plan. See n. 3, supra. In response, the Union argued the fourteen employees should receive their full accrued benefits regardless of their layoff status on February 6.
 
 
 18
 On November 21, 1984, the Company issued checks to its employees, thereby paying out the pension plan. On January 15, 1985, the Union received a letter from the Company, dated January 7, 1985, denying the Union's request for reconsideration of the payout computations. The Union responded by seeking arbitration, but the Company refused, contending the grievance was untimely. Shortly thereafter, the Union filed its unfair labor practice complaints with the NLRB.
 
 
 19
 The ALJ who conducted the hearings on the Union's complaints found the fourteen employees in question were plan "participants" who were "affected" by the termination of the plan, "since with the termination of the plan they lost benefits which would have matured had the plan continued." As affected participants, the fourteen "should have received 100 percent of their then-accrued benefits as did other employees on the Employer's payroll rather than a percentage of their then-accrued benefits equivalent to the percentage of their vested benefits." The ALJ concluded that the Company had engaged in an unfair labor practice in reducing the amounts paid to the employees in question without the Union's approval. The ALJ recommended that the Company be ordered to cease and desist its unfair labor practice and pay full pension benefits, plus interest, to the employees in question; viz., those previously paid only their deferred vested benefits.
 
 
 20
 The Board reversed the ALJ in a three-page opinion. After summarizing the facts and arguments, the Board ruled:
 
 
 21
 This case presents us with a contract dispute. We note the absence of evidence that the Respondent acted out of animus toward the Union, or in bad faith, or that the Respondent sought to undermine the Union. The Board held in NCR Corp., 271 NLRB 1212 (1984), that when the dispute is solely one of contract interpretation (as it is here) the Board will not attempt to determine which of two equally plausible contract interpretations is correct. Accordingly, we find no unfair labor practice here.
 
 
 22
 The principal issue upon appeal is whether the Board's decision to dismiss the Union's complaint has a rational basis in the record.
 
 II.
 
 23
 From the foregoing, it is seen that on the one hand, the respondent and Company insist that the pension benefits of the fourteen employees involved herein accrued as of February 6, 1984, when the Internal Revenue Service approved the termination of the pension plan. On the other hand, the petitioner Union insists that the pension benefits of the fourteen employees in question did not accrue until the "payout" of the pension benefits in November of 1984, even though those individuals were not employed by the Company on February 6, 1984. Having carefully considered the record herein, the briefs of the parties, and after hearing oral argument, the court agrees with the Board that there are two equally plausible contract interpretations. Therefore, the Board's decision to dismiss the Union's complaint has a rational basis in the record. Accordingly, we AFFIRM the Board for the reasons stated in its Decision and Order dated December 16, 1987, and reported at 287 NLRB No. 83.
 
 
 24
 WELLFORD, Circuit Judge, concurring.
 
 
 25
 I concur in Judge Milburn's well reasoned opinion. I add only that there is a strong policy favoring the exhaustion of ERISA claims before they are brought to court. See, e.g., Kross v. Western Electric Co., 701 F.2d 1238, 1244-45 (7th Cir.1983). See also the dissenting opinion of Judge Leonard Garth in Wolf v. National Shopmen Pension Fund, 728 F.2d 182, 191 (3rd Cir.1984). In this case, it would appear that plaintiff has attempted, on behalf of a few union members, an end run around this exhaustion requirement of ERISA. The plan involved in this case is clearly and undisputedly an ERISA plan. The employee participants have a right to seek administrative relief if dissatisfied with actions taken by trustees and administrators. I would also hold the union plaintiff precluded from charging the employee with an NLRA violation based on a claimed contractual violation with respect to union members who are ERISA plan participants until and unless it were determined that ERISA and/or plan remedies were exhausted.
 
 
 26
 The unfair labor practice act charged before the Board here arose out of an expert's determination of benefits due under the plan and the claimed refusal of the employer to bargain concerning this action.
 
 
 27
 Whether the ERISA plan payments were correct or not, then, should in the first instance be determined with respect to the requirements of ERISA, not the NLRA. Furthermore, failure to comply with known reasonable time requirements of the ERISA plan in a claim for reconsideration, or for redetermination, under ERISA, should not be a basis, as urged by plaintiff, to require arbitration or an alternative NLRB resolution of what is essentially an ERISA plan dispute. I do not read Laborers Fund v. Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, 108 S.Ct. 830 (1988) to indicate to the contrary, as urged in the Union's reply brief.
 
 
 28
 Capital City Lumber v. NLRB, 721 F.2d 546 (6th Cir.1983), cert. denied, 465 U.S. 1029 (1984), also relied upon by plaintiff, involved cessation of payments altogether by an employer to a welfare and pension fund. This was deemed to be an unfair labor practice, but there was no administrative opportunity by plan administrators to consider interpretation of the plan and its benefits. It is distinguishable on its facts from this case.
 
 
 29
 I would CONCUR in the affirmance here.
 
 
 30
 Years of
 Continuous Service Percentage
Less than 5 0 %
 5 25
 6 30
 7 35
 8 40
 9 45
 10 50
 11 60
 12 70
 13 80
 14 90
 15 or more years 100 %
 
 
 
 [1]
 The Union alleged the Company violated three sections of the NLRA: sections 8(a)(1) and (5) and 8(d) (codified at 29 U.S.C. Secs. 158(a)(1), (5) and (d))
 
 
 [2]
 The Board held in NCR Corp., 271 NLRB 1212 (1984), that when a dispute is solely one of contract interpretation, the Board will not attempt to determine which of two equally plausible interpretations is correct
 
 
 [3]
 Section 5.5 sets forth the applicable percentages to be used in computing the deferred vested benefit (ALJD 4; GCX 3, pp. 12-13):
 
 
 [4]
 The record does not reveal the exact reasons for the decision to terminate the Holcroft Retirement Trust Plan and replace it with the Thermo Electron Retirement Plan, which at that time covered virtually all other domestic divisions of Thermo Electron. J.A. 112. Holcroft/Loftus is a wholly owned subsidiary of Thermo Electron, and we note that there is no dispute in this case regarding the subsidiary's right to terminate its pension plan and replace it with its parent's plan